STATE, Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL
RAILWAY COMPANY, Appellant.

*September 14—September 29, 1908.*

*Constitutional law: Regulation of interstate commerce: Powers of
Congress and of the states: Restricting hours of labor of tele-
graph operators, etc.: State law conflicting with act of Con-
gress.*

1. Regulation of the relation between master and servant as to acts
   done in interstate commerce, including restriction of the hours
   of labor, is within the power to regulate commerce among the
   several states, conferred upon Congress by sec. 8, art. I, Const.
   U. S.

2. State legislation which directly and intentionally controls and
   regulates interstate commerce is prohibited; but an indirect or
   remote influence upon such commerce is not universally suffi-
   cient to invalidate an act of a state legislature within its police
   power.

3. The right of the state, in the exercise of its police power, to pro-
   tect its citizens generally from perils resulting from excessive
   hours of labor by railroad employees, is not impaired by the
   federal constitution except as such legislation shall interfere
   with or restrain interstate commerce in a respect in which Con-
   gress has to some extent acted upon the general subject.

4. Regulation of the hours of labor of telegraph operators and train
   dispatchers on railroads in a state is within the power of the
   state, even though interstate commerce may be indirectly af-
   fected thereby, so long as Congress has not acted in the matter;
   but when Congress has enacted a law regulating or restricting
   the hours of service of operators engaged in interstate com-
   merce, regulation of those hours either directly or indirectly
   is beyond the power of the state.

5. The act of Congress of March 4, 1907, limiting, after March 4,
   1908, the hours of service of operators and train dispatchers
   employed by carriers in interstate commerce to nine hours in
   any twenty-four hour period in certain places and to thirteen
   hours in others, was a clear declaration that that particular
   subject should be under federal and not state regulation.

6. Ch. 575, Laws of 1907 (sec. 1816*m*, Stats.), prohibiting after Janu-
   ary 1, 1908, any corporation operating a line of railroad in
   whole or in part in this state from requiring or permitting any
   operator to remain on duty for more than one period of eight

consecutive hours, is in conflict with and in negation of the act of Congress of March 4, 1907, and cannot be enforced as to operators engaged in the moving of interstate trains or traffic.

7. Ch. 575, Laws of 1907 (sec. 1816m, Stats.), cannot be limited in its operation to employees engaged exclusively upon trains or business wholly within the state, and be sustained and enforced to that extent, because such a limitation is contrary to the express terms of the act; because it is not clear that the generality of the restriction was not an essential element of the entire legislative scheme; and because the impracticability of limiting hours devoted to domestic commerce alone is so obvious as to preclude belief in any such legislative intent.

8. The act of Congress of March 4, 1907, being limited in its operation to carriers engaged in interstate commerce and to the conduct of their employees so engaged, to the exclusion of any who might be engaged purely in the domestic affairs of the employer, is valid.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed.*

Action for penalty under ch. 575, Laws of 1907, for that on the 11th day of January, 1908, one McGrath was a telegraph operator in defendant's station at Milwaukee engaged in reporting and receiving orders affecting the movement of cars, engines, and trains of the defendant company, and operating signal devices; that on said day the defendant required, allowed, and permitted said McGrath to be and remain on duty for said defendant twelve consecutive hours, not by reason of any casualty upon said railroad.

The answer set up numerous separate defenses, most of them attacking the validity of the state law as inimical either to the Fourteenth Amendment of the United States constitution or to certain provisions of our own constitution, and some of them asserting certain technical grounds of escape from the words of the act. By the second and fifth defenses it was set forth that the defendant's road ran through several states; that it was engaged in both interstate and intrastate business by the same employees, trains, cars, appliances, and track; that it was unavoidable that the same operator should

work upon all trains passing over the same division of the road, both those whose termini were wholly within the state and those which crossed the state line; that it was wholly impossible that either class of trains should be directed or governed by a separate man; that during the excess time of employment of McGrath there was one train as to which he made reports, received orders, etc., which ran wholly within the state and carried nothing of interstate commerce, but that the great majority of trains in any way acted upon by him were interstate commerce trains; that any attempt to separate interstate from domestic commerce in the operation of trains and the regulation thereof by said operatives would result in great danger, delay, interference, and expense to the interstate commerce; that the statute in question was therefore void as restricting and regulating interstate commerce in defiance of the constitution of the United States conferring upon Congress the power to regulate such commerce, and also of the act of Congress of March 4, 1907 [ch. 2939, 34 U. S. Stats. at Large, 1415, U. S. Comp. Stats. Supp. 1907, p. 913], which prescribed a different and longer service for the same employees.

The separate defenses of the answer were each met by a separate demurrer, except the first, which merely denied indebtedness for the penalty. The court below sustained the demurrer to all of said defenses except the first. The defendant declining to amend, judgment was entered for the plaintiff for the sum of $1,000 with costs, from which the defendant appeals.

For the appellant there was a brief by *C. H. Van Alstine* and *H. J. Killilea,* attorneys, and *Burton Hanson,* of counsel, and a reply brief by *Burton Hanson,* attorney, and the cause was argued orally by *Mr. Hanson* and *Mr. Van Alstine.*

For the respondent there was a brief by the *Attorney General, A. C. Titus,* assistant attorney general, *F. E. McGov-*

*ern,* district attorney, and *N. L. Baker,* assistant district attorney, and the cause was argued orally by *Mr. Baker.*

DODGE, J.   The primary and most earnestly argued question is whether the act (sec. 1816*m,* Stats.; Laws of 1907, ch. 575) prohibiting a corporation operating a line of railroad, in whole or in part, in this state, to require or permit any (telegraph or telephone) operator (including train dispatcher) to remain on duty for more than one period of eight consecutive hours, so regulates interstate commerce intentionally or by necessary effect that it invades the power conferred upon Congress by sec. 8, art. I, Const. U. S., "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes," that it cannot stand.

That the regulation of the relation between master and servant as to acts done in interstate commerce is within the power thus conferred upon Congress is authoritatively decided by the *Employers' Liability Cases,* 207 U. S. 463, 494, 28 Sup. Ct. 141.   It is categorically so declared in the opinion of the court, although three of the five justices who concurred in the decision withheld their assent from this proposition, which, however, received the approval of the three justices who dissented from the ultimate decision.   We can discover no distinction in principle between the subject of regulation considered in that case, namely, the responsibility of the employer for injuries to an employee, though due to the negligence of a fellow-servant, and the subject of the act under consideration, which is the prohibition of employers from imposing upon employees excessive hours of labor. Both must seek their justification for governmental action in the same principles and reasons, either in the protection of a class of employees from requirements hurtful to them, or in the protection of the welfare and safety of the public and of the commerce from dangers supposed to arise by reason of burdensome responsibilities or perils imposed upon the

employees of railroads. While the thing primarily regulated is not commerce, the regulation of the conduct of the individual while engaged in carrying on that commerce so directly affects it that the latter is thereby regulated.

But the mere fact that in some degree interstate commerce is affected by the act of a state legislature is not universally sufficient to condemn that act. The power of the state to control the conduct of individuals therein for the safety of the community is not taken away by the provision of the federal constitution above mentioned merely because some fanciful or remote influence upon interstate commerce may result. Property may be taxed upon its value, although that value in part depends upon a franchise, or ability to use it, in interstate commerce, even though it may appear that the increased burden of taxation upon it must be paid out of the earnings of interstate commerce, and that, therefore, the charges upon such commerce will probably be increased. Dishonest practices by peddlers may be forbidden and punished by a state, notwithstanding they are practices by which some peddlers effect sales in the course of interstate commerce. *Henderson B. Co. v. Kentucky,* 166 U. S. 150, 17 Sup. Ct. 532. On the other hand, state legislation is prohibited which directly and intentionally controls and regulates interstate commerce, as, for example, an act which in terms limits freight or passenger charges for interstate carriage, or which imposes a direct prohibition or charge upon the importation of property from one state into another. *Wabash, St. L. & P. R. Co. v. Illinois,* 118 U. S. 557, 7 Sup. Ct. 4; *Bowman v. C. & N. W. R. Co.* 125 U. S. 465, 8 Sup. Ct. 689; *Covington & C. B. Co. v. Kentucky,* 154 U. S. 204, 14 Sup. Ct. 1087. Between these two extremes, however, lies a broad field for legislation claimed to be justified by necessary protection of the safety of the local community, which more or less directly obstructs, restrains, and regulates the transaction of interstate commerce—legislation not en-

acted for that purpose, but incidentally having the result.
The supreme court of the United States, in *Covington & C.
B. Co. v. Kentucky, supra,* has classified that field into three
classes of legislative acts: The first, where the states have
plenary power and Congress has no right to interfere, which
concern the strictly internal commerce of the state, and,
while the regulation may affect interstate commerce indi-
rectly, its bearing is so remote that it cannot be termed in
any just sense interference.   The second includes cases of
what may be termed "concurrent jurisdiction," where the
states may act in the absence of Congressional action.   Ob-
viously this field must be one where Congress has right and
power to act if it sees fit, but where some restraint and regu-
lation is necessary, and the authority therefor is deemed to
be conceded to the states pending nonaction of Congress.
The third is the class where, from the very intimacy with,
and directness of effect upon, interstate commerce of any leg-
islative action, and national scope of the subject of legisla-
tion, it is presumed that the refraining of Congress from
promulgating any regulations is intended to declare a policy
that the subject shall be free from regulation.

Pretty obviously, under the decisions of the supreme court
of the United States, the act we are considering must fall in
the second class.   The safety of the public may be so im-
periled by the employment of incompetent or disabled per-
sons in and about railroads, navigation, and the like that the
necessity for some legislation in regard thereto is manifest,
and the forbearance of Congress to legislate might well be
deemed significant of its policy to leave the subject of regu-
lation to the legislatures of the several states.   In this line
it has been held that examination of pilots or railroad en-
gineers with reference to physical capacity, especially color
blindness, as a condition of their employment, is competent
for a state.   *Smith v. Alabama,* 124 U. S. 465, 8 Sup. Ct.
564; *Nashville, C. & St. L. R. Co. v. Alabama,* 128 U. S.

96, 9 Sup. Ct. 28. As pointed out in the latter case (128 U. S. 101, 9 Sup. Ct. 29) : "Such legislation is not directed against commerce; it only affects it incidentally." In the former case it is suggested that acts much more intimately connected with the commerce itself would be competent, such as those requiring safeguards and signals in running trains, provision for the safety of passengers, regulating the manner of heating cars (*New York, N. H. & H. R. Co. v. New York,* 165 U. S. 628, 17 Sup. Ct. 418), regulating the speed of trains (*Erb v. Morasch,* 177 U. S. 584, 20 Sup. Ct. 819), requiring the stopping of trains at certain stations (*Gladson v. Minnesota,* 166 U. S. 427, 17 Sup. Ct. 627), and others of like import. From these we cannot doubt that prohibition of an overfatigued telegraph operator from directing the operation of trains falls within the state's power to control, even though thereby the conduct of interstate commerce might be impeded or burdened. But this power in the states is subject to that provision in the constitution that Congress shall have power to regulate interstate commerce; that is, to prescribe the restrictions and limitations under which it shall be conducted, and when it prescribes those regulations it does so to the exclusion of state legislation accomplishing a like regulation directly or indirectly, and whether intended for that purpose or not. That is declared in all of the cases above cited, conceding to the states authority over such subjects in the absence of Congressional legislation.

Within the field of authorized Congressional action the federal power must, in the nature of things, be supreme in all parts of the United States.

"This constitution, and the laws of the United States which shall be made in pursuance thereof, . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Par. 2, art. VI, Const. U. S.

In *Cooley v. Board of Wardens,* 12 How. 299, 318, it was said of this class of legislation:

"It is not the mere existence of such power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the states, and that the states may legislate in the absence of Congressional legislation."

In *Pennsylvania v. Wheeling & B. B. Co.* 18 How. 421, where a state law authorized the building of a bridge over a navigable water, it was declared that even in the matter of a bridge, "if Congress chooses to act, its action necessarily precludes the action of the state." In *U. S. v. C. & N. W. R. Co.* 157 Fed. 321, 330, SANBORN, J., remarks:

"The constitution reserved to the nation the unlimited power to regulate interstate and foreign commerce, and, if that power cannot be effectually exercised without affecting intrastate commerce, then Congress may undoubtedly in that sense regulate intrastate commerce so far as necessary, in order to regulate interstate commerce fully and effectually. . . . That power is not subordinate, but it is paramount, to all the powers of the states. If its independent and lawful exercise of this Congressional power and the attempted exercise by a state of any of its powers impinge or conflict, the former must prevail and the latter must give way." See, also, *Gibbons v. Ogden,* 9 Wheat. 1, 209, 210.

It will be observed from these utterances that it is not a mere question of conflicting laws in the two jurisdictions, so that the law of a state will be valid so far as not antagonistic to a federal law. The question is more properly one of jurisdiction over the subject, the holding being that within the second class of subjects above outlined silence of Congress is deemed a relegation to the states of such jurisdiction and authority, but action by Congress upon the particular subject is deemed an assertion of the federal power, a declaration of the policy that the subject shall be under federal and not state regulation, and that, therefore, the power shall no longer rest in the state to exercise that authority which by

the constitution of the United States was surrendered to the federal government when and if Congress deemed its exercise advisable.

On March 4, 1907, before the act now under consideration was passed, and even before it was introduced in the Wisconsin legislature, Congress had legislated fully upon the subject of hours of labor for the very class of employees affected by sec. 1816m. It then provided (ch. 2939, 34 U. S. Stats. at Large, 1415, U. S. Comp. Stats. Supp. 1907, p. 913) that it should be unlawful for any common carrier subject to the act to require or permit any employee subject to the act to be or remain on duty for a period longer than sixteen consecutive hours, and that no operator or train dispatcher should be required or permitted to remain on duty for a longer period than nine hours in any twenty-four hour period in places continuously operated night and day, nor for a period longer than thirteen hours in places operated only during the daytime, with exceptions in case of emergencies. This was a clear declaration by Congress of a will and policy that, so far as the regulation and safeguarding of interstate commerce might properly be affected by prescribing hours of labor for such employees, the subject should be under control of Congress and not of the state legislatures. Doubtless the state legislatures persisted in their power to protect the safety of their respective communities by reasonably regulating the hours of service of railroad employees, with the limitation, however, that they must not thereby restrict or effectively regulate interstate commerce. Under many of the decisions above cited the state was thereby precluded from enacting any law of that sort which would have that effect, for the field of policy and legislation was thus assumed by Congress and withdrawn from state competency. *State v. Mo. Pac. R. Co.* (Mo.) 111 S. W. 500.

Apart from this view, however, it is too obvious to need more than statement that the legislation fixing nine and thir-

teen hours, respectively, as the permitted term of employ-
ment was declaration of a federal policy on that subject,
and that a state law excluding interstate railways from the
use of their employees on interstate commerce for one of the
nine hours or for five of the thirteen hours would be in di-
rect conflict with that policy.   The absence of such an em-
ployee at a small station upon an interstate road might well
be a most serious inconvenience and burden upon both the
celerity and safety of interstate commerce past that station,
and requirement of such absence would be in direct antag-
onism to the policy of the federal law permitting presence
and employment.   Not less obviously the act of Congress de-
clared a policy that interstate railroads should have a rea-
sonable time in which to adjust their business to the new re-
strictions, by postponing the date when the law should be-
come operative for one year after its passage, thus indicating
that such period of time was so necessary to reasonable con-
venience of interstate commerce.   Indeed, this latter impli-
cation is not only clear from the act, but made the more cer-
tain by reference to the debates and reports of committees at-
tending the consideration and passage of the law of Con-
gress.   Hence a state provision to the effect that the time
for such preparation and adjustment should be restricted to
the 1st of January, 1908, as contained in ch. 575, Laws of
1907, is in direct conflict with the policy of Congress.   *State
v. Mo. Pac. R. Co., supra.*   We are therefore constrained to
the conclusion that restriction of hours of labor of telegraph
operators engaged in moving interstate trains or traffic is a
field of legislation forbidden to the states by the federal con-
stitution; but also that the limitation contained in our stat-
ute is in conflict with and in negation of the act of Congress,
and cannot be enforced as to such employees.

It may not be out of place to reiterate what has already
been said, that the right of the state, in the sincere exercise
of its police power, to protect its citizens generally from any

perils resulting from excessive hours of labor by railroad employees, is in no way impaired by the federal constitution except as such legislation shall interfere with or restrain interstate commerce in a respect in which Congress has deemed wise to regulate it. The conduct of persons within the state inimical to public safety is within the police control of the state, whether those persons be engaged in interstate commerce or not, so long as restrictions upon their conduct will not affect the interstate commerce. *Mo., K. & T. R. Co. v. Haber,* 169 U. S. 613, 18 Sup. Ct. 488; *Reid v. Colorado,* 187 U. S. 137, 147, 148, 23 Sup. Ct. 92; *Gibbons v. Ogden,* 9 Wheat. 1, 104; *Asbell v. Kansas,* 209 U. S. 251, 28 Sup. Ct. 485.

The further contention is made by the respondent that, even if it be beyond the power of the state to restrict the services of an operator engaged in moving interstate trains, it is competent to so restrict as to one engaged exclusively upon trains or business wholly within the state, and that the law may be construed as so limited and its validity be sustained to that extent. The principle invoked is doubtless sound, if it is reasonably possible to separate the permissible from the forbidden, and to believe that the legislature intended by the act to affect the one and omit the other. On this subject the *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141, are entirely germane and controlling. It is there pointed out that by its terms that act is aimed simply at the employer, and makes no distinction in denunciation of his acts whether they be done in interstate or intrastate business, so that it in terms regulates purely domestic acts and transactions. Ch. 575, Laws of 1907, is even more objectionable in this regard than the Employers' Liability Act, for it in terms is directed to every corporation operating a line of railroad, in whole or in part, in the state of Wisconsin, thus expressly including those who are engaged in interstate commerce. But it is also open to the other objection,

held to be fatal, that it restricts the employment of all operators without discrimination as to the character of their services. This alone, under the reasoning of the *Employers' Liability Cases, supra,* must condemn the state act; for it is matter of common knowledge, and is set up as a fact by the answer, that any operator who works upon trains or transportation wholly within the state also necessarily and at the same time works upon interstate trains and transportation. *State v. Mo. Pac. R. Co., supra.*

The state legislature has in terms undertaken to restrict hours of work of employees engaged in safeguarding and conducting interstate commerce as well as domestic, and, controlled as we must be by the decision of the federal supreme court, we cannot import a meaning contradictory to the express words. Neither can we feel any certainty that the generality of the restriction was not an essential element in the entire legislative scheme, so that we might believe the legislature would have imposed upon domestic commerce, or on employees exclusively engaged therein, burdens not also resting on entirely similar acts of employees involving interstate trains or commerce.

Apart, however, from the controlling effect of the reasons urged in the *Employers' Liability Cases,* and in addition thereto, we think the impracticability, if not impossibility, of limiting hours of work devoted to domestic commerce alone, is so obvious as to preclude belief in any such legislative purpose. That impracticability is largely shown by facts alleged in the answer, but also by facts which are matter of common knowledge. The direction and dispatching of every train on an interstate railway necessarily involves knowledge in the train dispatcher of all other trains which are in the same vicinity at the same time, and also ability to control such other trains. An interstate train from Milwaukee to Chicago cannot be safely forwarded, if, under the direction of a separate employee, a local train may be moving

between Milwaukee and Racine over the same track at the same time, or nearly so. The very switching at local stations must be within the knowledge and under the control of him who is to decide upon and direct the most important of interstate transportation. Obviously division of authority over these subjects would be fraught with great perils and delays to both kinds of transportation. Hardly any act of a train dispatcher on a busy railroad can be conceived which does not affect both interstate and domestic commerce. He cannot move or stop the most distinctively local train without affecting the interstate train, or *vice versa*. No extra or special can be put on the division without adjustment of other trains. Of course, also, every interstate train carries some purely intrastate freight or passengers. Many purely domestic trains carry some freight or passengers in transit to extrastate destination. It would seem that any severance of control over state from interstate trains involved so much of confusion and probability of danger, and its possibility even is so doubtful and experimental, that no legislature would absolutely precipitate it without careful consideration nor without providing in the act for the event of the failure of such experiments. For this reason as well we are convinced that the legislative purpose involved what the legislative words include, the regulation of services of all operators, and would in no wise be satisfied, even in part, by a restriction to those whose acts affect only domestic commerce, if indeed there are any such.

But it is claimed that the federal act of March 4, 1907, itself is unconstitutional upon the same ground that the Employers' Liability Act was so held in the case already mentioned, reported at 207 U. S. 463, 28 Sup. Ct. 141. That case, from amongst great contrariety of opinion of individual justices, finally decided the very narrow proposition that the mere fact that a person or corporation is engaged in interstate commerce does not confer upon Congress authority to

regulate its acts not connected with such commerce. The court took judicial notice of the fact that nearly all railroad companies engaged in interstate commerce are also engaged in business which is purely domestic to some individual state, as, for instance, in transportation wholly within the state, but also in the maintenance of factories and repair shops and other operations in no wise affecting interstate commerce. That law was addressed to every common carrier engaged in interstate commerce, and regulated every such common carrier in its relations with each and every of its employees wholly without regard to the kind of service rendered by such employees. It was held that by its terms it sought to regulate that relation with employees not engaged in interstate commerce—a boiler-maker in its engine shops, a carpenter repairing its warehouses, or a sweeper in the barns of an express company,—and that, therefore, it was not within any power conferred upon Congress, notably not within that to regulate interstate commerce. The act of Congress of, March 4, 1907, was passed after that case had been decided in the same way in the lower court, and after a writ of error had been for some time pending in the supreme court, and the department of justice had asked, and been granted, right to be heard on behalf of the United States on the question of constitutionality. The contention of those who attacked the Employers' Liability Law was doubtless well known to the Interstate Commerce Commission and to the Congress. It is therefore entirely natural and probable that an attempt should have been made to differentiate the later enactment from the former one and to escape the somewhat technical ground of invalidity in the former. It is without surprise, therefore, that we find such differentiating provision in the first section, to the effect "that the provisions of this act shall apply to any common carrier or carriers, their officers, agents *and employees* engaged in the transportation of passengers," etc., between the several states; and also: "The

term 'employees' as used in this act shall be held to mean persons actually engaged in or connected with the movement of any [interstate] train." It will also be noted that the hours of employment are prescribed for "any employee subject to this act." We cannot doubt that by these phrases the operation of the present act was limited not only to employers engaged in interstate commerce, but to the conduct of employees so engaged to the exclusion of any who might be engaged purely in the domestic affairs of the employer, and that by this very distinction and limitation of the application of the act the legislation is brought within that portion of the decision which holds that the Employers' Liability Act would have been valid had it been confined in application to the relation of employees while engaged in interstate commerce. 207 U. S. at p. 496, 28 Sup. Ct. 141.

Since our conclusion is fatal to ch. 575, Laws of 1907, no possible necessity for or benefit from a new trial can result. Hence:

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for the defendant.