STATE, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*January 10—February 18, 1913.*

*Railroads: Sleeping-cars: Regulation: Keeping upper berths closed: Statutes: Construction: Constitutional law: Police power: Interstate commerce: Taking property without compensation.*

1. Sleeping-car service incident to passenger traffic on railroads is a public service which, with the property devoted thereto, may be regulated and controlled in promotion of the public welfare, subject to constitutional limitations.

2. Ch. 272, Laws of 1911 (sec. 1636*p*, Stats.),—providing that "whenever a person shall engage and occupy a lower berth in a sleeping-car and the upper berth in the same section shall at the same time be neither engaged nor occupied, the upper berth shall not be let down but shall remain closed until engaged or occupied,"—is a general law, designed to contribute to the general welfare of all the people.

3. The interests of the public being involved and the effect of the regulation in question being to contribute to the comfort and convenience of the traveling public and thereby to promote their health and the general welfare, such regulation is a proper exercise of the legislative power.

4. The act may and should be construed as applicable to intrastate traffic only.

5. So construed, it affects only indirectly and incidentally the in-
terstate commerce carried on in sleeping-cars used for both
intrastate and interstate business, and is not invalid on that
ground, there being no specific federal regulations with which
it conflicts, either in the Interstate Commerce Act or in the
regulations made by the interstate commerce commission.

6. The act does not deprive the owner of the sleeping-cars of his
property without just compensation, nor is it repugnant to any
other constitutional guaranty.

APPEAL from a judgment of the circuit court for Dane
county: E. RAY STEVENS, Circuit Judge.    *Reversed.*

On August 17, 1911, James T. Hall, a passenger on the
defendant's railroad lines between Madison and Star Lake,
Wisconsin, after he had boarded defendant's train at Portage,
Wisconsin, engaged the lower berth of section 11 in the sleep-
ing-car "Waubeno" for the night of that day, and the berth
was occupied by him between Portage and Star Lake in this
state.    The upper berth of section 11 was not engaged or oc-
cupied, but was let down and kept down during the night by
the porter.    The state alleges a violation of the provisions
of ch. 272 of the Laws of 1911 (sec. 1636*p,* Stats.), an act
relating to sleeping-car berths, and brings this action to re-
cover the penalty prescribed therein.

The answer admits the allegations of the complaint, ex-
cept that the defendant became indebted to the state for the
violation of the provisions of ch. 272, Laws of 1911.    It
appears from the answer that the defendant operates about
145 sleeping-cars on its system of more than 7,000 miles of
railway in the several states of the Union in which it oper-
ates, and that only two sleeping-car routes, requiring four of
these sleeping-cars, run between points and on lines which
are wholly within the state of Wisconsin.    It is alleged that
these four sleeping-cars are parts of trains which are engaged
in interstate traffic and which carry in other sleeping-cars of
the trains both state and interstate passengers, and that the
commingling of state and interstate traffic is an economic

necessity. It is also alleged that the alleged cause of action arose when the sleeping-car "Waubeno" traveled on its route between Chicago, Illinois, and Star Lake, Wisconsin; that it carried state and interstate passengers; that between Chicago, Illinois, and New Lisbon, Wisconsin, it was part of a train engaged in interstate traffic; that all sleeping-cars in the United States have upper and lower berths as sleeping-car units; that all sleeping-cars engaged in interstate traffic are subject to the jurisdiction of the interstate commerce commission, under the so-called Interstate Commerce Act, approved February 4, 1887, and as amended June 18, 1910, which commission has full power to regulate the use and operation of such sleeping-cars; and that this commission has regulated the price of sleeping-car units, has specifically fixed the prices of upper and lower berths, and has made no regulation requiring that upper berths which are not in use or engaged shall be kept closed.

All of the allegations of the answer, except parts of the allegations contained in the two following paragraphs, were admitted by a stipulation filed before evidence was taken:

"That compliance with said ch. 272, Laws of 1911, would convenience the occupant of the particular lower berth only, and would not in any manner or to any extent benefit or convenience, or add to the comfort, or promote the health or safety, of the occupants of the other berths of the car, either lower or upper; that compliance with said chapter would inconvenience and injuriously affect passengers occupying lower berths; that the defendant carries many thousands of passengers annually in its sleepers operated in Wisconsin, state and interstate, more than one half of which passengers occupy lower berths, while at the same time the upper berths are occupied, without discomfort or sickness being caused thereby, other than the discomfort which necessarily inheres in the use of a sleeping-car berth; that if such discomfort is to some extent lessened by raising the upper berth so that the occupant of the lower berth may have the use of the entire section, he may, under the rules and regulations of the de-

fendant, procure the same by paying the lawful charge therefor, which in the instant case mentioned in the complaint was $1.20.

"That sleeping-cars constructed as are the sleeping-cars of this defendant, as hereinbefore described, are operated in every state and territory of the United States, and have been for more than a quarter of a century last past; that none of the states or territories has by law or otherwise made it unlawful for the owners of such sleeping-cars to operate them with upper berths, nor has any state or territory by law or otherwise prohibited, in any manner, the use of such upper berths by passengers who desired to use the same."

There was some dispute as to the scope of the stipulation, but there is no dispute that all of the allegations of the answer which are disputed are contained in the two paragraphs quoted.

Evidence was introduced to the effect that the air of a sleeping-car is purer than the air of the ordinary passenger coach; that fresh air is admitted to a sleeping-car through the openings about the doors and windows and, when the outside temperature permits, through the opening of windows into the lower berths; that foul air is taken from sleeping-cars through ventilators in the top of the cars; that free circulation of air in sleeping-cars is conducive to health; that circulation of the air in sleeping-cars is obtained by fans placed at either end of the cars, which force a current of air along the aisle; and that the opening of the upper berths has but little effect upon the circulation of the air in the lower berth when the lower berth is made up and ready for occupancy.

After making its case on the admissions of the answer, the state objected to the introduction of any evidence by the defense; and after the evidence had been received the state moved to strike out such testimony, on the ground that the allegations of the answer failed to state facts sufficient to constitute a defense.    This motion was denied.

The court made the following findings of fact and stated the conclusions of law as follows:

"1. That on August 17, 1911, James T. Hall was a passenger from Portage, Wisconsin, to Star Lake, Wisconsin, on a sleeping-car owned and operated by the defendant; that he engaged, paid for and occupied a lower berth on said sleeping-car; that the upper berth of said section was not engaged or occupied; that he demanded that the upper berth of the said section remain closed, pursuant to the provisions of ch. 272, Laws of 1911; that defendant, acting through its agents and servants, refused to close the same, but left the same down through the entire night.

"2. That the closing of upper berths in sleeping-cars has very little effect upon the circulation of air in such sleeping-cars when all lower berths are made up and ready for occupancy.

"3. That the lowering of upper berths does not endanger the lives, health or safety of persons occupying lower berths in sleeping-cars.

"4. That the closing of the upper berth will be a convenience to the person occupying the berth below the same and will add to the comfort of such person alone and not to that of the public generally.

"5. That the defendant has a right to charge for the use of the space occupied by the upper berth and that such right is the property of the defendant.

*"Conclusions of law.*

"1. That ch. 272 of the Laws of 1911 is not a valid exercise of the police power.

"2. That ch. 272 of the Laws of 1911 is not a valid exercise of the reserve power to alter or amend the charter of the defendant.

"3. That ch. 272 of the Laws of 1911 is void and of no effect, because it takes defendant's property without just compensation and without due process of law.

"4. That judgment be entered dismissing plaintiff's complaint."

This is an appeal from the judgment dismissing the complaint.

For the appellant there was a brief signed by *L. H. Bancroft,* attorney general, and *Russell Jackson,* deputy attorney general, and oral argument by *Mr. Jackson.*

For the respondent there was a brief by *Burton Hanson, C. H. Van Alstine,* and *H. J. Killilea,* and oral argument by *Mr. Van Alstine.* They contended that the act in question, if an attempted exercise of the police power, is an unreasonable and arbitrary exercise of that power and violates secs. 9, 13, art. I, Const. *State v. Redmon,* 134 Wis. 89, 110, 111, 114 N. W. 137; *Lawton v. Steele,* 152 U. S. 133, 137, 14 Sup. Ct. 499, 501; *New York ex rel. Silz v. Hesterberg,* 211 U. S. 31, 39, 29 Sup. Ct. 10; *Mutual L. Co. v. Martell,* 222 U. S. 225, 233, 32 Sup. Ct. 74; *Chicago, B. & Q. R. Co. v. Illinois ex rel. Drainage Comm'rs,* 200 U. S. 561, 592, 593, 26 Sup. Ct. 341; *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 292, 19 Sup. Ct. 465; *Gilman v. Philadelphia,* 3 Wall. 713, 729; *Connolly v. Union S. P. Co.* 184 U. S. 540, 22 Sup. Ct. 431; *Asbell v. Kansas,* 209 U. S. 251, 256, 28 Sup. Ct. 485; *Mugler v. Kansas,* 123 U. S. 623, 661, 8 Sup. Ct. 273; *Western Union T. Co. v. Kansas ex rel. Coleman,* 216 U. S. 1, 30 Sup. Ct. 190. They also argued that the act violates amendm. XIV, Const. of U. S.; that it does not constitute an amendment to the charter of respondent; that passengers who occupy lower berths while the uppers remain unoccupied do not constitute a class for the purpose of legislation; and that the act violates sec. 8, art. I, Const. of U. S., and the Interstate Commerce Act.

SIEBECKER, J. The trial court held that ch. 272, Laws of 1911 (sec. 1636*p,* Stats.), providing that "whenever a person shall engage and occupy a lower berth in a sleeping-car, and the upper berth in the same section shall at the same time be neither engaged nor occupied, the upper berth shall not be let down, but shall remain closed until engaged or occupied," is invalid, because it is an infringement on defendant's liberty

and right of property, secured by constitutional guaranties. The other parts of the act provide penalties for violation of the foregoing section. The subject embraced in this legislation, namely, regulation of sleeping-car service, is a business that has become an incident to the passenger traffic of the railroad service of this country, and, from its nature and relation to the people generally, it is a public service. *Nevin v. Pullman P. C. Co.* 106 Ill. 222. The right to provide reasonable regulation of a public service is fully recognized and well established in the law, and the property devoted to such business becomes impressed with a public interest and is subject to control by the state for the common good, in promotion of the general welfare. *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65, and cases there cited. This power of regulation by the state, however, is always restricted by the constitutional limitation, imposed on legislative action, for the protection of inherent rights to life, liberty, and property, and if such rights are impaired by a legislative act it is invalid and must be so treated by the courts. *State v. Redmon,* 134 Wis. 89, 114 N. W. 137. Since, then, this legislation pertains to a public service, the purpose and object of the regulation must be considered from the viewpoints of the rights of the public to control the property devoted to this business in promotion of the public interest, and the rights of the defendant to be secure against invasion of any of its property rights as secured to it by the constitutions of the state and nation.

It is urged that the act is invalid because it is clearly and beyond doubt a flagrant violation of defendant's liberty to conduct its business in its accustomed way, and because it arbitrarily interferes with its property rights, in that the regulation provided is in no way promotive of the public welfare, as to its health, comfort, or convenience. As declared in *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499, "To justify the state in thus interposing its authority in behalf

of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." It is strenuously urged that the act does not operate on the public generally. This claim is not tenable. The act in its terms is general in its application and embraces all persons. It includes in its scope all of the public coming within its operation and applies to all parties engaged in the conduct of a sleeping-car business. It is, however, asserted that the act applies to so few persons as compared with the great mass of mankind that the effect of its provisions is to confer a special privilege on a comparatively small class of individuals. This misconceives the object and result of the regulation. If we find the law promotive of the comfort and convenience of the public and that it applies to every one who may apply for the service, then it is a general law designed to contribute to the general welfare of all the people. To make a law general it is not requisite that all members of the public come directly and immediately in contact with the regulation provided; it is sufficient if every one is compelled to comply therewith whenever they place themselves within the field of its operation.

But it is argued that the regulation in no way promotes the general welfare, because compliance therewith does not affect the public health nor afford the traveling public conveniences or comforts in any substantial degree. The trial court held that the evidence showed that the public convenience and comfort as a result of compliance with the act would affect the traveling public in but a slight degree, and therefore the regulation did not promote the public welfare, and that its enforcement would operate so oppressively on the defendant as to deprive it of its liberty in the conduct of the business, and would invade its property rights to such an extent as to result in a taking of its property without just com-

pensation and without due process of law.   The court's view
of the evidence was evidently the result of the court's errone-
ous idea of what, in the legal sense, is essential to present an
occasion or exigency involving the general welfare.   It is
common knowledge that practices and conditions in the con-
duct of the railway passenger traffic of the country, which,
in a superficial view, seem, in their effect, of slight impor-
tance to travelers, do in reality materially and substantially
affect their comfort and convenience and thus tend to affect
their health.   They therefore furnish a ground for control-
ling the conduct of such business in the interest of the com-
fort and convenience of the public.   In the light of such
common knowledge, the evidence in the case tends to show
that the effects of this regulation do contribute to the comfort
and convenience of the traveling public and thereby contrib-
ute to promote their health and the general welfare.   All the
facts and circumstances disclose that the interests of the pub-
lic are involved and that the regulation, prescribed for con-
ducting this particular part of the sleeping-car business, is
an essential factor in furthering the public interests, and
hence such regulation is a proper one for the exertion of leg-
islative activity.   In *Lake Shore & M. S. R. Co. v. Ohio,*
173 U. S. 285, 19 Sup. Ct. 465, the court, speaking of the
authority of the state to prescribe regulations designed merely
to promote the public convenience, declared:

"There are, however, numerous decisions by this court to
the effect that the states may legislate with reference simply
to the public convenience, subject of course to the condition
that such legislation be not inconsistent with the national con-
stitution, nor with any act of Congress passed in pursuance
of that instrument, nor in derogation of any right granted
or secured by it."

See on the same subject, the opinion in *Atlantic Coast Line
R. Co. v. North Carolina Corp. Comm.* 206 U. S. 1, 27 Sup.
Ct. 585; *New York, N. H. & H. R. Co. v. New York,* 165
U. S. 628, 17 Sup. Ct. 418.

It remains, however, to consider whether this statute is inconsistent with any right guaranteed to the defendant by the national or state constitutions. The terms of the act are broad enough in their scope to embrace all the berths of all sleeping-cars in service within the boundaries of the state. The act, however, must be applied to such cars as the legislature obviously intended should come within its provisions. It is clear that the berths of a car engaged and occupied by persons who are traveling as interstate travelers cannot be included, since that would be repugnant to the federal constitution, which commits regulation of interstate traffic to Congress, but, if the act can reasonably be interpreted and so applied as to exclude such traffic, it must be presumed that the legislature had no intention to have it apply to traffic beyond their power to regulate. Since the provisions of the act, in their ordinary significance, can be made applicable to intrastate traffic only, it must be considered, under the circumstances, that the legislature intended that it should be so applied. Applying the law to intrastate traffic, is it an interference with interstate commerce which is carried on in the cars doing both an intrastate and interstate business? The fact that it may affect in some slight degree the conduct of interstate business in such cars does not make the regulation objectionable on that ground. There are no specific federal regulations touching this matter which conflict with those of the state, and hence there is nothing to prevent full compliance with the state's requirement. Under such circumstances, the effect of the state regulation can, at most, do no more than incidentally affect the interstate commerce carried on by the defendant, and therefore the objections raised against the law on this ground are not sustained. *McDermott v. State,* 143 Wis. 18, 126 N. W. 888, and cases there cited, and those cited above.

It is contended that the law seeks to regulate a business which is controlled by the so-called Interstate Commerce Act

and that the interstate commerce commission has assumed jurisdiction in the matter, as is evidenced by its regulation of interstate rates for berths in sleeping-cars. But does this action of Congress and of the federal commission under it show that the state regulation infringes in any way upon the federal regulation? As we have seen, there is nothing required by the state law that is repugnant to the control thus exercised by Congress, nor is there any direct interference with interstate traffic under operation of the federal law. The control exercised by these two authorities can therefore be separately carried out without undue obstruction or interference, and hence the action of Congress in the matter does not preclude the state from exerting its authority under the police power. We are persuaded that the statute is not in conflict with the so-called Interstate Commerce Act in its regulation of intrastate traffic. *State v. C., M. & St. P. R. Co.* 136 Wis. 407, 117 N. W. 686.

It is also averred that the enforcement of the state law will deprive the defendant of its property without just compensation, in that compliance therewith compels the defendant to devote the space occupied by a lowered upper berth to the uses of a public purpose without compensation. True, as claimed, the defendant has the right to charge for the use of the upper berth and the space it occupies at the rate fixed by the interstate commerce commission. It is argued that the act is a material interference with defendant's freedom to use that space and the berth in its accustomed way and is a taking of its property for a public purpose without compensation. We discover no such injurious consequences from compliance with the requirements of this law. The law permits the berths to be occupied and used when any person desires them and thus the defendant is secured against loss for services it may be able to furnish the public. The only act required of it out of its accustomed way of using the space and berth is to keep the upper berth closed until it is engaged for

occupancy by some one.    If compliance with this command imposes extra burdens, they are not of such an unusual nature as to be oppressive; and if it involves additional cost in the conduct of the business, then the defendant can readily be secured against such loss by having the rate adjusted to meet this burden.    It must be held that defendant is in no way deprived of the use of its property for a public purpose without just compensation.    Applying the act to intrastate transactions appertaining to a service within legislative control, we find the legislative power of the state has been properly exerted to regulate the conduct of this business, and that it is not repugnant to any of the constitutional guaranties of the state and the nation, nor in conflict with any law of Congress on the subject.    From these premises it necessarily follows that the circuit court erred in dismissing the complaint. The state is entitled to judgment for recovery of the penalty upon the grounds stated.

*By the Court.*—The judgment appealed from is reversed, and the cause remanded to the circuit court with directions to award the plaintiff judgment for the amount of the penalty and for costs, as indicated in the foregoing opinion.