CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN, Respondent.

*February 22—March 11, 1913.*

*Railroad Commission: Review of orders: Power of circuit court: Railroads: Passenger service: Regulation: Stopping trains at small stations: Statute construed: Interstate trains: "Passenger trains:" Constitutional law: Interference with interstate commerce: Reasonably adequate service: Classification.*

1. Under sec. 1797—18, Stats., which provides for actions in the circuit court for Dane county to test the validity of orders of the Railroad Commission, that court has power only to pass upon the lawfulness or reasonableness of the order, and cannot make an administrative order based on evidence taken in court or in the original exercise of its own discretion.

2. Where an order of the Commission requiring certain service by a railway company was based wholly upon a statute and not upon an exercise of discretion or judgment, the only question presented by the action in the circuit court is the lawfulness of such an order, including the question of the validity of the statute upon which it was based.

3. Sec. 1801, Stats. 1911, which requires every railroad company to maintain a station at every village on its line having a post-office and a population of 200 or more, and to stop at least one passenger train each day each way at such station, if so many are run, and that "if four or more passenger trains are run each way daily, at least two passenger trains each day each way shall be stopped," applies to interstate trains as well as to domestic trains.

4. A train is an interstate train if it runs from one state into another and is engaged in traffic between the two, irrespective of its speed or the number of stops it makes.

5. An accommodation freight train is not a "passenger train," within the meaning of said sec. 1801.

6. In an action to review an order of the Railroad Commission based upon said sec. 1801, the court is concerned only indirectly with the conditions shown to exist in the particular case, they being important only as an index of conditions presumably existing in similar localities throughout the state and as bearing in general upon the constitutionality of the law.

7. Although the legislature had previously delegated to the Railroad Commission general powers to regulate railroad service,

it might still legislate specifically upon that subject. The leg-
islature cannot exhaust or diminish its own powers by con-
ferring upon subordinate commissions or bodies the right to
exercise administrative functions.

8. In determining the validity of state laws regulating railroad
service, the following principles are relevant: (a) The primary
duty of a railroad is to render reasonably adequate local serv-
ice, both domestic and interstate; (b) State regulations which
go no further than to require such service are neither unrea-
sonable nor unduly restrictive of interstate commerce; (c) A
state has the right to demand reasonably adequate interstate
service as well as domestic service at any station within its
borders; (d) In determining what is reasonably adequate serv-
ice, due regard may be had to the convenience as well as the
necessities of the public; and (e) A slight or indirect inter-
ference with interstate commerce does not render a state regu-
lation void, provided it is not made for such purpose but for
another legitimate object.

9. When the primary duty of reasonably adequate local service is
met, a railroad may then provide special facilities for through
or interstate traffic, and any attempt on the part of a state to
regulate such special service, to the detriment and hindrance
of interstate traffic, will be held void as an unlawful burden
upon interstate commerce.

10. Within the field of its discretion, however, the power of the leg-
islature to prescribe regulations as to the stoppage of trains
is supreme, and its determination must control unless clearly
unreasonable or unless it contravenes some specific or implied
constitutional provision, state or federal.

11. Where the statutory requirements for train service are made to
depend upon the population of a station, upon the fact that it
has a postoffice, and upon the number of trains passing it each
way daily, the statute is founded upon a proper basis of classifi-
cation.

12. In considering the validity or reasonableness of sec. 1801, Stats.
1911, not merely the specified population of the village, but also
the number of people presumably living in adjacent territory
and served by the station, are to be taken into account, as also
the fact that where four or more trains are run daily each
way the act affects only two and the road is left free to run un-
hampered as many more as it desires.

13. Since interstate traffic embraces travel from points outside the
state to points within the state and *vice versa*, and it appears
by the evidence that the interstate passenger traffic of small
stations within the purview of said sec. 1801 forms a substan-
tial part of the total passenger business in the state, the state

has a right to make reasonable regulations to promote it and to further the necessities and convenience of interstate passengers.

14. Where the legislature has, within the field of its discretion, fixed the minimum of local service at a quantum which cannot judicially be declared unreasonable, it is not a valid objection to the statute that a serious interference with the through traffic of the road (in which competition is keen and time of the essence) would result from the stopping of one or more of its limited interstate trains at the smaller stations, since it is optional with the railroad company to do that or to put on extra trains.

15. It is not a valid objection to a statute requiring only reasonably adequate passenger service that such service would entail some financial loss, especially where it is not shown that the whole passenger revenue within the state is not ample to meet the additional expense with a fair margin of profit.

16. In determining what is reasonably adequate service, the paramount factor is public need and convenience, modified by many other considerations, such as the size of the station, the extent of the demand for transportation, and the cost of giving additional service.

17. Sec. 1801, Stats. 1911, has suitable relation to the public need and convenience, is founded upon an appropriate basis of classification, and cannot be judicially declared to require more than reasonably adequate passenger service for the stations embraced within its terms, and it is therefore valid.

KERWIN and TIMLIN, JJ., dissent.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

Action to determine the validity of an order of the *Wisconsin Railroad Commission* requiring the plaintiff railway company to stop two of its passenger trains each way daily at the station of Cochrane, Wisconsin, pursuant to the provisions of sec. 1801, Stats. One Schlosstein, a resident of Cochrane, filed a petition with the *Railroad Commission* alleging that the passenger service at said station was inadequate and praying for an order compelling plaintiff to stop two of its passenger trains each way daily at said station as required by the statute. Thereupon, after due notice, a hearing was had before the *Railroad Commission* from which it appeared that the pas-

senger service at Cochrane was as follows: North-bound train No. 91, a freight, carrying passengers, daily, except Sunday, due at 10:17 a. m.; passenger train No. 53, north bound, daily, due at 10:58 a. m.; south-bound passenger train No. 54, daily, due at 9:09 a. m.; and freight train No. 92, south bound, carrying passengers, daily, except Sunday, due at 1:10 a. m. It is admitted that Cochrane has a postoffice. Further facts shown by the hearing are thus stated in the decision of the *Railroad Commission:*

"Cochrane is an incorporated village of about 260 inhabitants. It has four general stores, two saloons, two lumber yards and planing mills. The village of Buffalo, having a population of about 250, lies a short distance west of Cochrane. Alma, the county seat of Buffalo county, having a population of 1,000, is situated 8.3 miles north of Cochrane. Fountain City, having a population of approximately 1,000, lies about eight miles south of Buffalo. All of the limited trains on respondent's line stop at Alma. Two passenger trains each way daily stop at Fountain City. . . .

"The respondent's road is located on the east bank of the Mississippi river and runs through a territory that is sparsely settled. About ninety per cent. of all the passenger traffic over this line consists of people going from Chicago to St. Paul and points in Minnesota, the Dakotas, and the entire Northwest and Canada. Two trains are run each way daily between Chicago and Portland and Seattle. One train leaves Chicago in the morning, and from St. Paul runs over the Northern Pacific line to the Northwest. Another train leaves Chicago in the evening, and from St. Paul goes over the Great Northern line to the Northwest. There are two corresponding trains east bound. There is also a train each way daily between Chicago and Minneapolis, known as the Minnesota Limited, which serves the traffic to Minneapolis and St. Paul on the one hand, and to Chicago and St. Louis on the other. In addition to these interstate trains there is a local train each way running between Savanna and Minneapolis, which takes care of the traffic in the state of Wisconsin.

"The west-bound train from Chicago to the Northwest by way of the Northern Pacific line from St. Paul is known as

train No. 51 and is composed of standard Pullman and tourist cars. The number of cars in the train is twelve. The corresponding east-bound train is known as train No. 53 and contains the same number of cars. Similar trains routed over the Great Northern line from St. Paul to and from the Northwest are known as trains 49 and 52 respectively. Trains 47 and 48 are each known as the Minnesota Limited, and each is composed of one observation car, three standard sleeping-cars, one St. Louis standard sleeping-car, two Chicago coaches, one combined mail and baggage car, and two baggage cars. Train No. 58 consists of two sleeping-cars, and from five to eight baggage and express cars. All of these interstate trains are heavy and run at a maximum speed of fifty miles per hour in order to make connection with trains for the east at Chicago and with trains for the west at St. Paul. As the distance between Chicago and St. Paul over respondent's line is thirty-three miles greater than that over the line of the C. & N. W. R. Co., and twenty-seven miles greater than that over the line of the C., M. & St. P. R. Co., it becomes necessary for the respondent to operate its trains at a high rate of speed in order to meet the schedule time of its competitor's trains between such points as well as to make the connections mentioned."

It appeared that the petitioner's chief complaint was that it was impossible for residents of Cochrane and vicinity to go to any point either north or south by train to transact business of any consequence and return on the same day; and that the railroad company's objection to stopping any more trains was because all its other trains were heavy interstate limited trains, which were run in competition with like trains upon other roads, and that if it was required to stop such trains at all stations having a population of 200 it would be impossible to continue them in service as limited trains.

The *Railroad Commission* stated in its decision that, independent of any statutory provisions on the subject, it would feel constrained to hold that the existing passenger service afforded the village of Cochrane was adequate under the circumstances, and that therefore interstate trains could not be

11]     JANUARY TERM, 1913.        659

Chicago, B. & Q. R. Co. v. Railroad Commission, 152 Wis. 654.

required to stop at that station. But that since the statute
fixed the quantum of passenger service for every station com-
ing within the classification made, it deprived the *Railroad
Commission* of any discretion in the matter, and the order
was made accordingly.

To review the order of the *Railroad Commission* the
present action was brought pursuant to the provisions of
sec. 1797*m*—64, Stats. The trial court, in addition to facts
already recited, found "that the passenger service afforded
Cochrane when the order in question was made was not ade-
quate or reasonable; that the said order was a reasonable ex-
ercise of the powers vested in the defendant *Commission.*"
As conclusions of law the court held the order valid and en-
tered judgment dismissing plaintiff's complaint upon the
merits, from which judgment plaintiff appealed.

For the appellant there was a brief by *Woodward & Lees,*
and oral argument by *G. M. Woodward.*

For the respondent there was a brief by the *Attorney Gen-
eral, Russell Jackson,* deputy attorney general, and *Byron H.
Stebbins,* first assistant attorney general, and oral argument
by *Mr. Jackson* and *Mr. Stebbins.*

VINJE, J. It will be observed from the foregoing state-
ment of facts that the *Railroad Commission* based its order
upon the statute (sec. 1801, Stats.) and not upon an exer-
cise of discretion or judgment on its part that the service was
inadequate. Indeed, it states that were it not for the statute
depriving it of the exercise of discretion it would come to a
contrary conclusion and refuse to make the order requiring
additional trains to be stopped at Cochrane. The trial court,
however, finds that the passenger service at Cochrane was not
adequate or reasonable, and that the order of the *Railroad
Commission* was a reasonable exercise of the powers vested
in it. So we have a situation where the *Railroad Commis-
sion* disaffirms the exercise of discretion in making the order,

and the trial court affirms it on the ground that it was made pursuant to a reasonable exercise of the powers vested in it, and that upon the facts found by the trial court the order was right. The question, therefore, presents itself, Can the circuit court for Dane county, in which jurisdiction to test the validity of orders made by the *Railroad Commission* is vested, make an administrative order based upon the original exercise of its own discretion? The provisions of the statute authorizing the action to review orders made by the *Railroad Commission,* in so far as they speak definitely, must control. Sec. 1797—16, Stats., reads:

"Any railroad or other party in interest being dissatisfied with any order of the commission fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices or service, may commence an action in the circuit court against the commission as defendant to vacate and set aside any such order on the ground that the rate or rates, fares, charges, classifications, joint rate or rates, fixed in such order, is unlawful, or that any such regulation, practice or service, fixed in such order, is unreasonable, in which action the complaint shall be served with the summons."

It will be noticed that the statutory power of the circuit court is limited to that of vacating and setting aside an order made by the *Railroad Commission* or refusing to do so; and that the order can be attacked only on two grounds: one, that the rate or rates, fares, charges, classifications, joint rate or rates fixed in such order is *unlawful;* and the other, that any such regulation, practice, or service fixed in such order is *unreasonable.* The statute therefore delegates only judicial functions to the court by empowering it to pass upon the lawfulness or reasonableness of the *Railroad Commission's* order. To clothe a tribunal with the power to adjudge whether or not an order made by another body is reasonable is quite different and distinct from investing such tribunal with the power to make a reasonable order in the first instance. The one is a

delegation of judicial power, the other of administrative power. The circuit court for Dane county can exercise no administrative functions and none were attempted to be delegated to it by the statute referred to. That the legislature intended the circuit court only to review orders made by the *Railroad Commission* and not to make new ones based upon evidence taken in court is made still clearer by secs. 1797—16 (b), 1797—16 (c), and 1797—16 (d), which provide for sending the case back to the *Railroad Commission* for reconsideration and refinding if new or additional evidence is adduced. In the instant case, therefore, since the *Railroad Commission* did not make an order based upon its discretion, but one based upon the statute, the only question presented by the action was the lawfulness of the order, which of course raised the question of the constitutionality of sec. 1801. And that question is the only one the appeal presents upon the merits. The material part of the section reads as follows:

"Every corporation operating a railroad shall maintain a station at every village, whether incorporated or not, having a postoffice and containing two hundred inhabitants or more, through or within one eighth of a mile of which its line or road runs, and shall provide the necessary arrangements, receive and discharge freight and passengers, and shall stop at least one passenger train each day each way at such station, if trains are run on such road to that extent; and, if four or more passenger trains are run each way daily, at least two passenger trains each day each way shall be stopped at each and every such station."

It is not seriously contended by either side but that the statute, if valid, applies as well to interstate passenger trains as to domestic trains. If it does not apply to interstate trains then it does not apply to the plaintiff at all, for it runs no domestic passenger train in Wisconsin. The local train stopping at Cochrane is spoken of by counsel for plaintiff as though it were a domestic train. But the evidence shows that

it runs from Savanna, Illinois, through Wisconsin, to Minneapolis, Minnesota, and from there back to Savanna, Illinois. It is none the less an interstate train because it is a local or unlimited train. The speed of a train or its infrequency of stopping furnishes no absolute criterion of an interstate character. A train is an interstate one if it runs from one state into another and is engaged in traffic between the two, irrespective of its speed or the number of stops it makes. It is quite evident that the legislature must have intended to include interstate trains as coming within the purview of the statute, else its enactment would have been a mere idle ceremony. It is doubtful if there be a single station in the state of less than 5,000 inhabitants which has passing through it four or more domestic trains each way daily, and there certainly are few, if any, of any size that have that many domestic trains daily each way. So it seems clear that interstate trains were intended to be included within the terms of the statute. There is certainly nothing in its language to indicate any limitation as to the character of the passenger train, and we must hold that there is none. It is also clear that accommodation freight trains are excluded. They are not passenger trains in the ordinary sense of the term. Their time of arrival and departure is quite uncertain; they furnish no means of carrying anything but hand baggage, and their passenger service can in no sense be said to be adequate or reasonable. *People ex rel. Cantrell v. St. L. & T. H. R. Co.* 176 Ill. 512, 52 N. E. 292; *Missouri Pac. R. Co. v. Kansas,* 216 U. S. 262, 280, 281, 30 Sup. Ct. 330.

Construing the statute, therefore, as including interstate trains and excluding accommodation freight trains, we face this question: Is it constitutional? The major part of plaintiff's brief is devoted to showing that the passenger service is adequate at Cochrane and that it would be placing an unreasonable burden upon it to require an additional local train or to require one of its limited trains to stop there. We are con-

cerned only indirectly with the conditions shown by the evidence in the instant case. Such conditions are important, but only as an index of conditions presumably existing in similar localities throughout the state and as bearing in general upon the constitutionality of the act in question.

It is claimed that the statute is unreasonable and void, and that the order made is confiscatory in that it operates to take plaintiff's property without due process of law and creates an unwarranted burden upon interstate commerce; that it is purely arbitrary, as it takes no account whatever of any general or particular conditions; and that if four trains are run daily each way, then two each way must be stopped daily, regardless of whether or not the necessities or convenience of the people of the village require it.

By ch. 362, Laws of 1905, the legislature conferred upon the *Railroad Commission* the power to regulate rates, services, etc., of railway companies. This act, impliedly at least, repealed the provisions of sec. 1801, Stats. (1898), as it then stood. By ch. 483, Laws of 1911, sec. 1801 was re-enacted with certain amendments and made to read as above quoted. In the meantime the *Railroad Commission* by a series of orders made in cases similar to the one at bar had held that passenger service like that given Cochrane was reasonably adequate. See *Tate v. C., B. & Q. R. Co.* 2 Wis. R. R. Comm. Rep. 348; *Kemp v. C., B. & Q. R. Co.* 3 Wis. R. R. Comm. Rep. 350; *Maiden Rock v. C., B. & Q. R. Co.* 4 Wis. R. R. Comm. Rep. 311; *Dyer v. C., M. & St. P. R. Co.* 2 Wis. R. R. Comm. Rep. 621; and *Schmidt v. G. N. R. Co.* 4 Wis. R. R. Comm. Rep. 121. From such rulings and legislation it must be inferred that the legislature deemed it best to exercise its own judgment as to what should be considered reasonably adequate passenger service for stations containing a population of 200 or more. That it was within its power to legislate specifically upon this subject after having delegated to the *Railroad Commission* the general powers found in

ch. 362, Laws of 1905, and the acts amendatory thereof, cannot be questioned. By conferring the powers mentioned upon the *Railroad Commission* the legislature did not part with the right to exercise such powers itself whenever it saw fit. The legislature cannot exhaust or diminish its own powers by conferring the right upon subordinate commissions or bodies to exercise administrative functions. The quantum of legislative power remains the same. It is nondelegable.

Before considering the question of the constitutionality of the statute, either on the ground that it is unreasonable as applied to domestic traffic or that it is repugnant to the interstate commerce clause of the federal constitution, it may be well to advert to a few well settled principles governing the right of a state to regulate railroad passenger service within its borders. The authorities are practically unanimous in declaring that the primary duty of a railroad is to furnish reasonably adequate local service, both domestic and interstate. *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465; *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, 20 Sup. Ct. 722; *Minneapolis & St. L. R. Co. v. Minnesota,* 193 U. S. 53, 24 Sup. Ct. 396; *Mississippi R. R. Comm. v. Ill. Cent. R. Co.* 203 U. S. 335, 27 Sup. Ct. 90. When this primary duty is met the road may then provide special facilities for the accommodation of through or interstate traffic, and any attempt on the part of a state to regulate such special service will be held void if it interferes with interstate commerce. *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, 20 Sup. Ct. 722. The rule is thus stated by Mr. Justice DAY in *Herndon v. C., R. I. & P. R. Co.* 218 U. S. 135, 156, 30 Sup. Ct. 633:

"Where a railroad company has already provided ample facilities for the adequate accommodation of the traveling public such as may be proper and reasonable at any given point, and operates interstate commerce trains, carrying pas-

sengers through the same places, at which such interstate trains do not stop, a state regulation which requires the stopping of such interstate trains, in addition to ample facilities already provided, to the detriment and hindrance of interstate traffic, is an unlawful regulation and a burden upon interstate commerce."

The difficulty, however, lies not in determining what legal principle is applicable to a given situation, but in deciding the fact as to what constitutes reasonably adequate service.

The right of a state to demand reasonably adequate interstate as well as domestic service has been established beyond question. *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465; *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, 20 Sup. Ct. 722; *Mississippi R. R. Comm. v. Ill. Cent. R. Co.* 203 U. S. 335, 27 Sup. Ct. 90; *Atlantic Coast Line R. Co. v. Wharton,* 207 U. S. 328, 28 Sup. Ct. 121. In the *Lake Shore Case, supra,* the court, speaking of the validity of a statute of Ohio regulating the stoppage of trains, said:

"Certainly, the state of Ohio did not endow the plaintiff in error with the rights of a corporation for the purpose simply of subserving the convenience of passengers traveling through the state between points outside of its territory. . . . It was for the state to take into consideration all the circumstances affecting passenger travel within its limits, and as far as practicable make such regulations as were just to all who might pass over the road in question. It was entitled, of course, to provide for the convenience of persons desiring to travel from one point to another in the state on domestic trains. But it was not bound to ignore the convenience of those who desired to travel from places in the state to places beyond its limits, or the convenience of those outside of the state who wished to come into it. Its statute is in aid of interstate commerce of that character. It was not compelled to look only to the convenience of those who desired to pass through the state without stopping." Pages 301, 302.

In *Atlantic Coast Line R. Co. v. Wharton, supra,* it was held that the effect of an order made by state authority as a

direct regulation of interstate commerce may be tested by the local facilities existing at the station or stations at which the interstate commerce train has been commanded to stop.

In determining whether or not reasonably adequate service is furnished regard may be had to public convenience as well as public necessity. *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465; *Atlantic Coast Line R. Co. v. North Carolina Corp. Comm.* 206 U. S. 1, 27 Sup. Ct. 585; *State v. C., M. & St. P. R. Co., ante,* p. 341, 140 N. W. 70. "The power of the state," says the court in the *Lake Shore Case, supra,* "by appropriate legislation to provide for the public convenience stands upon the same ground precisely as its power by appropriate legislation to protect the public health, the public morals, or the public safety. Whether legislation of either kind is inconsistent with any other power granted to the general government is to be determined by the same rules." Page 300. In *State v. C., M. & St. P. R. Co.. supra,* our own court says:

"It is common knowledge that practices and conditions in the conduct of the railway passenger traffic of the country which, in a superficial view, seem, in their effect, of slight importance to travelers, do in reality materially and substantially affect their comfort and convenience and thus tend to affect their health. They therefore furnish a ground for controlling the conduct of such business in the interest of the comfort and convenience of the public."

That a state regulation may indirectly or in a slight degree affect or interfere with interstate commerce does not render it void if that is not its purpose and if it has another legitimate object. *Diamond G. Co. v. U. S. G. Co.* 187 U. S. 611, 23 Sup. Ct. 206; *McDermott v. State,* 143 Wis. 18, 126 N. W. 888; *Independent Tug Line v. Lake Superior L. & B. Co.* 146 Wis. 121, 131 N. W. 408; *State v. C., M. & St. P. R. Co.* 152 Wis. 341, 140 N. W. 70.

The principles above referred to may be summarized as follows: (a) Every station is entitled to reasonably adequate

domestic and interstate service; (b) state regulations which go no further than to require such service are neither unreasonable nor unduly restrictive of interstate commerce; (c) a state has the right to demand reasonably adequate interstate service as well as domestic service at any station within its borders; (d) in determining what is reasonably adequate service due regard may be had to the convenience of the public; and (e) a slight or indirect interference with interstate commerce does not render a state regulation void provided it is not made for such purpose but for another legitimate object.

Turning now to the application of these principles to specific cases, we find that a statute of Ohio which required that "each company shall cause three each way, of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at a station, city or village containing over three thousand inhabitants, for a time sufficient to receive and let off passengers," was sustained as not unreasonably interfering with interstate commerce or unreasonable on any other ground. *Lake Shore & M. S. R. Co. v. Ohio*, 173 U. S. 285, 19 Sup. Ct. 465.

In *Atlantic Coast Line R. Co. v. North Carolina Corp. Comm.* 206 U. S. 1, 27 Sup. Ct. 585, an order of a state railroad commission requiring the plaintiff to make daily connections at Selma with the Southern Railway was upheld, though the evidence showed a compliance therewith would result in a financial loss to plaintiff and require it to run an additional train. A state statute requiring the stoppage of all regular passenger trains running wholly within the state, at its stations at all county seats, long enough to receive and discharge passengers with safety, is valid, though such trains may carry interstate passengers who are to connect with interstate trains, and also carry the mails of the United States. *Gladson v. Minnesota,* 166 U. S. 427, 17 Sup. Ct. 627. In *St. Louis & S. F. R. Co. v. Troy,* 25 Okla. 749, 108 Pac. 753,

the supreme court of Oklahoma held that an order of the railroad commission requiring plaintiff to stop two passenger trains each way at the station of Troy, containing about 300 inhabitants, with one general store and two small stores, was not unreasonable. Substantially to the same effect is *Missouri, K. & T. R. Co. v. Witcher,* 25 Okla. 586, 106 Pac. 852. Orders of a railroad commission requiring an additional train each way to stop daily at the stations of Blue Creek and Arden, each containing about 200 people, was upheld by the supreme court of Washington in *State ex rel. G. N. R. Co. v. Railroad Comm.* 60 Wash. 218, 110 Pac. 1075, chiefly on the ground that public convenience required their stoppage in order that the residents thereof might be enabled to go to the county seat to transact business and return the same day. In *Atchison, T. & S. F. R. Co. v. State,* 28 Okla. 476, 114 Pac. 721, it appeared that two of plaintiff's passenger trains met at Belva, a station containing about thirty people, but with a thickly settled community around it. An order requiring an additional train each way daily to stop on flag signal was sustained.

In *Atlantic Coast Line R. Co. v. Wharton,* 207 U. S. 328, 28 Sup. Ct. 121, it appeared that eleven trains daily stopped regularly at a small station which was a junction point with a short branch road. It was held that a state order requiring the stoppage on signal of two of its fast mail trains was unreasonable. And where four trains a day each way stopped at a station containing about 4,500 people, a state statute which required the stoppage at that place of a through interstate passenger and mail train was held invalid. *St. Louis, I. M. & S. R. Co. v. State,* 85 Ark. 284, 107 S. W. 989. Likewise, where three south-bound trains stopped at a county seat of about 1,200 inhabitants, an order of the state railroad commission requiring the stopping of two additional south-bound interstate mail and passenger trains was held unreasonable. *Mississippi R. R. Comm. v. Ill. Cent. R. Co.* 203 U. S. 335, 27 Sup. Ct. 90. And a state statute which required a

through interstate passenger and mail train to turn aside from its direct route and run to a county seat three and one-half miles distant and back again, was held unconstitutional, it being admitted that the railway company otherwise furnished the county seat adequate passenger service. *Ill. Cent. R. Co. v. Illinois,* 163 U. S. 142, 16 Sup. Ct. 1096. In *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, 20 Sup. Ct. 722, a statute of Illinois which required all regular passenger trains to stop a sufficient length of time at county seats to receive and discharge passengers with safety was held unconstitutional as applied to a county seat at which four regular passenger trains each way daily stopped. It was sought to require the stopping of an interstate limited special in addition to the four passenger trains stopping regularly. In distinguishing this case from the case of *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, the court says:

"This case is readily distinguishable from the one under consideration in the fact that the Ohio statute required only that three regular passenger trains should stop at every station containing three thousand inhabitants, leaving the company at liberty to run as many through passenger trains exceeding three per day as it chose, without restriction as to stoppage at particular stations. In other words, it left open the loophole which the statute of Illinois has effectually closed." Page 520.

In *Herndon v. C., R. I. & P. R. Co.* 218 U. S. 135, 30 Sup. Ct. 633, it was held that a statute of Missouri which required all passenger trains to stop at all junctions within the state was unreasonable and void as applied to the junction of Lathrop, which had a population of about 1,000 and had two passenger trains each way stopping daily. It was there sought to secure the stoppage of an interstate limited train. See note to this case in 54 Law. Ed. 970.

Viewing the statute in question in the light of the principles of law relevant thereto and their application to particular states of fact as disclosed by the adjudicated cases, we must

determine whether it falls within or without the legislative field. That the legislature may prescribe reasonable regulations as to the stoppage of trains is admitted. Such admission, however, includes within it the further admission that within the field of its discretion the legislature is supreme, and its determination must control unless clearly unreasonable or unless it contravenes some specific or implied constitutional provision, state or federal. It is not for the court to square the act with its own judgment and declare it void if it fails to measure up to such standard. The court's duty is to sustain the statute unless it can be said that in its enactment the legislature exceeded its powers.

It will be observed that as a basis for a minimum passenger service the population of a station and the number of passenger trains passing it each way daily are made the main tests. That such tests are germane to the subject of the act can scarcely be doubted. The population of a station is usually not only a fair index of the amount of business the station itself will furnish, but also of that of the population tributary thereto, while the number of passenger trains run daily past a station measures the amount of passenger business done over the road and, in a degree, its ability to furnish additional facilities to the station without financial loss or without undue interference with through traffic. The furnishing of adequate mail facilities for the residents of the village and of the surrounding country was also in the legislative mind, as is evidenced by the provision that the station must have a postoffice in order to enjoy the service provided for in the act. So it must be deemed that a proper basis of classification is made by the statute.

The evidence shows that while in the instant case the population of Cochrane is only 260, yet almost 3,000 people are served by the railway at that point, and that is so despite the fact that the road runs along the western margin of the state with the Mississippi between it and Minnesota, thus cutting

off, as the fact is, practically all passenger business from the west. . It is fair, therefore, to presume that inland stations of no greater population would have tributary to them a greater number of people to be served at them than Cochrane has. When this fact is borne in mind, the placing of the population as low as 200 does not appear so unreasonable. Besides, the statute affects only one train if three or less are run daily. If four or more are run daily each way it affects only two. It leaves the road free to run unhampered as many more trains per day as it may desire. It therefore falls within the rule of *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, and not within that of *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, 20 Sup. Ct. 722; or that of *Herndon v. C., R. I. & P. R. Co.* 218 U. S. 135, 30 Sup. Ct. 633.

Under the passenger train schedule in force at Cochrane, it renders it practically impossible for its residents to go either north or south to near-by towns, transact business, and return the same day. This situation affects their convenience, and, as has been shown, that is a consideration of some importance in determining the reasonable adequacy of service. True, as has been observed before, the statute must stand or fall upon its main scope and upon its general application to villages throughout the state, and not upon its particular application to the village of Cochrane. But the fact remains that where only one train a day each way stops at a station, its residents are quite likely to be more or less hampered in the convenient transaction of business with neighboring towns along the line either on the one side or the other, or both.

It is urged that if plaintiff should be required to stop one of its limited interstate trains it would have to do so at the expense of interstate commerce. This contention is true only in part. The evidence discloses that plaintiff's receipts from domestic passenger business at Cochrane for the year 1911 were $985.87 and from interstate business $765.76. At four-

teen stations in Wisconsin, including Cochrane, varying in population from 200 to 535, for the same year its receipts from domestic passenger business were $16,179.08 and from interstate business $11,375.38. It will thus be seen that even from such small stations plaintiff's receipts from interstate passenger business is over one third that of its total passenger receipts. When, therefore, additional service is required, it is not accurate to say that it is at the expense of interstate traffic. Such additional service benefits interstate as well as domestic travel, and the state has the right and is in duty bound to see that both are adequately provided. The fact must not be overlooked that travel from a point in this state to a point in another state, or from a point outside the state to a point within it, is just as much interstate travel as is travel through the state between points outside its boundaries. Each kind of interstate as well as domestic travel is entitled to reasonably adequate service, and none is entitled to more at the expense of the other. The interstate passenger traffic at these small stations being a substantial part of their passenger business, the state has the right to make reasonable regulations to promote it and to further the necessities and convenience of interstate passengers.

It will be noticed that neither the statute nor the order of the *Railroad Commission* requires the plaintiff to stop one of its limited interstate trains. The plaintiff has the option to do that or to put on an extra train each way daily which shall stop at Cochrane. To do the former it is claimed would seriously interfere with its through traffic, as competition is keen and time is of the essence of such traffic. This no doubt is true. But since the primary duty of a carrier is to give reasonably adequate service to stations along its line, and since the legislature has within the field of its discretion fixed the minimum of such service at a quantum which cannot judicially be declared unreasonable, or held to unduly interfere with interstate commerce, the objection becomes untenable.

The evidence shows that to put on an extra local train each way daily would cost about $7,000 per month and that the estimated receipts would not equal the expense. It is not shown, however, that the whole passenger revenue of the road in this state is not ample to meet the additional expense with a fair margin of profit. But even if that were not so, if the service required is a reasonable one it is no answer to say that it would have to be performed at a financial loss. In *Atlantic Coast Line R. Co. v. North Carolina Corp. Comm.* 206 U. S. 1, 26, 27 Sup. Ct. 585, the court says: "Because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result." This is reaffirmed in *Mo. Pac. R. Co. v. Kansas,* 216 U. S. 262, 30 Sup. Ct. 330. In determining what is reasonably adequate service the paramount factor is public need and convenience, modified no doubt by many other considerations, such as the size of the station, the extent of the demand for transportation, as well as the reasonable cost of giving additional service.

Upon the whole it must be held that the statute in question has suitable relation to the public need and convenience, is founded upon an appropriate basis of classification, and cannot judicially be declared to require more than reasonably adequate passenger service for the stations embraced within its terms. The judgment of the circuit court must therefore be affirmed on the ground that the order made by the *Railroad Commission* was a lawful order.

*By the Court.*—Judgment affirmed.

KERWIN, J., dissents.

TIMLIN, J. (*dissenting*). I am unable to assent to the correctness of the majority opinion in this cause. By statutes now known as secs. 1797—1 to 1797—38 a comprehensive

plan of railroad regulation for this state is established. The *Railroad Commission,* an administrative board or body, is empowered to ascertain, declare, and enforce reasonable rates and adequate service, etc. This is done by order made upon complaint (sec. 1797—14 *et seq.*) and applies to all railroads in the state. Such order is reviewed in the circuit court by action against the *Commission* under secs. 1797—15, 1797—16, *et seq.* If any railroad shall fail, neglect, or refuse to obey any lawful requirement or order made by the *Commission,* or any judgment or decree made by any court upon its application, for every such violation, failure, or refusal such railroad shall forfeit and pay into the state treasury a sum of not less than $100 nor more than $10,000 for each offense. Sec. 1797—27. While these statutes were in force, ch. 483, Laws of 1911, was enacted. This last purports to amend sec. 1801 of the Statutes. It provides:

"Every corporation operating a railroad shall maintain a station at every village, whether incorporated or not, having a postoffice and containing two hundred inhabitants or more, through or within one eighth of a mile of which its line or road runs, and shall provide the necessary arrangements, receive and discharge freight and passengers, and shall stop at least one passenger train each day each way at such station, if trains are run on such road to that extent; and, if four or more passenger trains are run each way daily, at least two passenger trains each day each way shall be stopped at each and every such station. Every such corporation neglecting or refusing fully to comply with this section, after demand therefor by any resident of such village, shall forfeit not less than twenty-five nor more than fifty dollars for each and every day such neglect or refusal shall continue, one half to the use of the person prosecuting therefor."

By this statute the legislature undertook to take from the authority of the *Railroad Commission* the power to decide upon the adequacy of existing service and itself fixed a positive or arbitrary rule relative to the service. It also provided for the enforcement of this duty by a *qui tam* action for a for-

feiture of not less than $25 nor more than $50 per day. In the instant case the *Railroad Commission*, while finding that adequate service to the village of Cochrane did not require it, nevertheless undertook, by order made upon complaint, evidence, and hearing, to re-impose the duty on the railroad company which was already imposed thereon by the statute last quoted. I do not think the *Railroad Commission* had any jurisdiction so to do. Under this order of the *Commission* the railroad company is liable to a penalty for disobedience thereof amounting to not less than $100 nor more than $10,000 for each offense. Under ch. 483, *supra*, it was liable to a penalty of not less than $25 nor more than $50 for each and every day that it omitted to stop two passenger trains each day each way. Penalties cannot be multiplied or enlarged in this way. If the penalty is not enlarged, then there is no penalty for disobedience of the order and the order is an idle form of words. If the penalty fixed by ch. 483 still applies to infractions of that statute and controls notwithstanding the order of the *Commission*, then the order is void because unenforceable.

Again, the order of the *Commission* relates to a specified village (Cochrane), while ch. 483, *supra*, relates to each and every village along the line of the road in Wisconsin answering the calls of the statute. If the *Railroad Commission* had no jurisdiction to decide that the service complained of was adequate, it follows that it had no jurisdiction to decide that such service was inadequate. No jurisdiction is conferred upon that body to entertain a complaint and proceedings for the purpose of supplementing the legislative declaration of duty by an unenforceable declaration on the part of the *Commission*.

Next, when the matter reached the circuit court that court undertook not simply to review the order of the *Railroad Commission* with respect to the reasonableness or unreasonableness of such order, but assumed the administrative duty

of deciding in the first instance that the service formerly rendered was inadequate, and affirmed the order of the *Railroad Commission* upon a ground never passed upon by that administrative body. Clearly, I think the circuit court had no jurisdiction so to do. No such power is conferred upon the circuit court by statute, and surely judicial power at common law does not include it.

If either of these positions is correct, I think we should reverse the order of the circuit court and the order of the *Commission* as made without jurisdiction, and not overlook these fundamental errors and treat the case as if it were here upon a writ of error to a judgment of conviction in the *qui tam* action authorized by ch. 483, *supra.*

Next, it appears without dispute that the appellant is and has been supplying the village in question with one passenger train each way each day and with one mixed or accommodation train each way each day. Further, it appears without dispute that the appellant is not within ch. 483, *supra*, at all, and therefore not liable on account of intrastate trains because it does not run the requisite number of such trains. It does, however, run four interstate passenger trains each day each way, so that the effect of the statute in the instant case is to require the defendant to stop its interstate passenger trains each way at this diminutive village and at all villages of at least this population on its line of road in the state of Wisconsin.

The appellant enters the state of Wisconsin at a point where the southern boundary line of said state touches the Mississippi river and runs thence along the easterly bank of the Mississippi river to the city of Prescott in Pierce county, Wisconsin, where it crosses the St. Croix river and enters the state of Minnesota, a total of 223.13 miles in length within this state. Along this line there are seven villages of more than 200 and less than 300 inhabitants each; five villages of more than 300 and less than 400 inhabitants each; and

twenty-one stations all together. Alma, having a population
of 1,000 and the next station on appellant's line north of
Cochrane, is eight and three-tenths miles distant therefrom.
Fountain City, with a population of 1,000, is on appellant's
line about eight miles south of Cochrane. All of appellant's
limited interstate trains stop at Alma and two passenger
trains each way each day stop at Fountain City. This is an
important consideration with reference to the adequacy of
train service in so far as the rural population near Cochrane
is considered. The total revenue from the sale of passenger
tickets at the station in question for the year ending June 13,
1911, is $1,751.63, of which $985.87 was from the sale of
intrastate tickets and $765.76 from the sale of interstate
tickets. The appellant must either stop its interstate limited
trains or put on an extra passenger train in order to comply
with ch. 483, *supra*. To put on an extra train will require
an outlay of $84,000 per year, which it appears must cause
the appellant a great pecuniary loss.

I think the true way in which to uphold state authority
over interstate railroads is to be just and reasonable in its
exercise. Grasping for more than this, the state is apt to
lose the little it has. The decision of the *Commission* that
the former service was adequate, while it cannot be given con-
trolling weight, is, however, significant. I do not think that
public convenience requires either the stopping of these in-
terstate trains or this pecuniary sacrifice. Convenience is
an elastic term, and no doubt it would be more convenient to
have a train stop every hour at this village and it would be
confessedly inconvenient if no trains at all stopped there.
Between these extremes there is no doubt a broad field of leg-
islative discretion. There is a degree of inconvenience to
which the carrier may not subject the dwellers along its line,
even for the purpose of paying its operating expenses and
making up a fair return on its investment. But that does
not help much, because these conveniences shade off by im-

perceptible degrees into conditions where to the man of moderate desires their supply becomes luxury and their denial no longer a denial of the ordinary conveniences of life. But it also follows that unlimited legislative power in this direction would support legislative confiscation. Two hundred inhabitants, allowing for the ordinary percentage of infants, sick, and incapacitated, would ordinarily represent a very small number of persons able to travel or disposed to travel on a railroad. The statute must be tested by its general requirements, not only as regards the village of Cochrane, with a population of 260, but the other little villages along this line. I think from the standpoint of convenience a village of 200 or 260 people that has one passenger train each way per day, together with a mixed freight or accommodation train, is not badly served. The hours of arrival and departure of these several trains must be adjusted with reference to the length of the run and the number of stations, and these hours will necessarily be more convenient at some stations than at others, but that is unavoidable. I consider the case to be within the rule of and governed by *Herndon v. C., R. I. & P. R. Co.* 218 U. S. 135, 30 Sup. Ct. 633, and cases cited, and for this reason also the order appealed from should be reversed. This statute regulating the use of appellant's property is in the nature of a police regulation, and it appears to me to be an unnecessary and unreasonable interference with interstate commerce and therefore invalid. I also think that the basis of regulation is improper and unlawful, and that the necessities or conveniences of a village cannot be measured by the number of interstate trains which pass through or by it. *State v. Redmon,* 134 Wis. 89, 114 N. W. 137. The requirement must be based upon necessity or convenience of the public. I also think the proceedings above herein described and the penalties imposed by statute, conflicting and contradictory as they must appear on account of

the unusual procedure adopted in this case, should warrant the reversal of the judgment appealed from because of such interference. Considering each failure to stop each train each way as an offense, the penalties must be enormous when multiplied by the number of days multiplied by the number of small stations on this line.