5 Mich. App. 492 (1967)
147 N.W.2d 469
CHESAPEAKE & OHIO RAILWAY COMPANY
v.
PUBLIC SERVICE COMMISSION.
Docket Nos. 822, 823.
Michigan Court of Appeals.
Decided January 10, 1967.
Rehearing denied February 17, 1967.
Remanded for further proceedings June 8, 1967.
January 11, 1968.
*495 Paul C. Younger, Allan F. Schmalzriedt, and John J. Holden, for Chesapeake & Ohio Railway Company.
Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Hugh B. Anderson and David P. Van Note, Assistant Attorneys General, for Attorney General, and for Public Service Commission.
Steven L. Dykema, City Attorney, for City of Grand Rapids.
Roger P. O'Connor, Assistant Corporation Counsel, for City of Detroit.
Richard L. Spindle, City Attorney, for City of Wyoming.
Jacob I. Alspector, for Railroad Brotherhoods.
Remanded by Supreme Court to circuit court for further proceedings June 8, 1967. See 379 Mich 764.
Leave to appeal granted by Supreme Court January 11, 1968. See 380 Mich 752.
McGREGOR, J.
In November, 1964, the C & O Railway announced to the public, by newspaper advertisements, that its passenger trains, 14 and 15, which ran daily except Sunday between Grand Rapids and Detroit, would be discontinued on January 3, 1965. At the time the discontinuance was announced, C & O operated three pairs of passenger trains between Detroit and Grand Rapids. The first pair were train 14, which left Grand Rapids *496 at 7:30 a.m. and arrived at Detroit at 10:30 a.m., and train 15, which left Detroit at 5:20 p.m. and arrived at Grand Rapids at 8:25 p.m., both of which made regular stops at Plymouth and Lansing. The second pair were train 11, which left Detroit at 8:30 a.m. and arrived at Grand Rapids at 11:35 a.m., and train 12, which left Grand Rapids at 3:30 p.m. and arrived in Detroit at 6:30 p.m. The third pair were train 19, which left Detroit at 11:40 p.m. and arrived at Grand Rapids at 2:55 a.m., and train 20, which left Grand Rapids at 10:10 p.m. and arrived in Detroit at 2:20 a.m.
The relevant statutory provision, before it was amended by PA 1965, No 15 (Stat Ann 1965 Cum Supp § 22.32[c]), read as follows:
"Passenger service shall not be discontinued in this state without the permission of the commission and unless the railroad desiring to discontinue such service shall first file a petition with the commission, and hearing is held thereon as provided in section 22 of this act. The commission at such hearing shall inquire into the convenience and necessity of the service to the public and shall render its decision thereon. At any hearing upon such petition any person, association, corporation, municipality or governmental unit whose interests shall be adversely affected by the discontinuance of the service may petition the commission for leave to intervene in said proceedings and participate therein as a party. If it shall appear to the commission from the state of said applicant's interests that said interests may be adversely affected by the discontinuance of service, the commission shall grant permission to intervene; Provided, however, That the provisions of this act shall not apply to the revision of passenger service schedules, the consolidation of passenger trains, temporary or seasonal trains, nor to any railroad operating more than 2 passenger trains in each direction on a week day on the portion *497 of the railroad affected." CL 1948, § 462.13(c) (Stat Ann 1963 Cum Supp § 22.32[c]).
On December 21, 1964, the public service commission held a hearing on the proposed discontinuance of trains 14 and 15, at which time evidence was heard on the question of the effect on the public of the discontinuance of said trains and also on the issue of whether or not trains 19 and 20 were, in fact, passenger trains. Under the statute as it was then in effect, the public service commission had no authority to act in the matter if in fact the C & O railroad was operating three trains daily each way between the cities in question.
By its order of December 23, 1964, the public service commission ordered the railroad to continue the operation of trains 14 and 15. The commission held that because trains 19 and 20 were not really passenger trains, the railroad operated only two passenger trains within the meaning of the statute and, therefore, was not exempted from the jurisdiction of the commission. The commission found that in June of 1960, the C & O railroad started operating trains 19 and 20 for the carriage of mail, pursuant to a contract with the Federal government. Shortly after these trains were commenced, the railroad attached to them a passenger coach of an obsolete type. Within a few months, this coach was replaced by a combination passenger, mail, express, and baggage car. The commission found that this passenger coach was put on to the train to obtain a small amount of passenger revenue, to provide carriage for trainmen since a caboose could not be used at the high speeds at which trains 19 and 20 operated, and also to save crew wages since the union contracts provided for lower wages for employment on trains classified as passenger trains *498 than that paid for employment on freight trains. The commission's opinion read in part as follows:
"We find that the railroad's original and continuing purpose in attaching a combination coach to trains 19 and 20 was and is to achieve savings in crew costs and to provide a place for trainmen to ride. The fulfilling of a public need for transportation service at midnight and the obtaining of passenger revenues were and are no more than secondary or incidental reasons for the addition of a combination coach to trains 19 and 20.
"The passenger coach presently used on trains 19 and 20 is a combination passenger and baggage car, containing 28 seats instead of the more usual 56 seats. The combination car is ordinarily used only on trains 19 and 20, and no other coaches are ordinarily used on such trains. Other equipments on trains 19 and 20 include a locomotive, a railway postal office, and six `road railers,' which are mail cars capable of being pulled on the public highways by tractors. By way of contrast, trains 11 and 12, and 14 and 15 consist of a locomotive, mail car, diner, 2 or 3 passenger coaches, and 1 or 3 road railers.
"During the first 10 months of 1964, trains 19 and 20 handled 2,535 passengers and obtained passenger revenue of $9,500, an average of five passengers and $18 revenue per trip. * * *
"The revenue derived from mail, express, and other commodities on trains 19 and 20 is at least 20 times that derived from the transportation of passengers. In our opinion, the number of passengers and the amount of passenger revenue on trains 19 and 20 are de minimis. Trains 11 and 12 earned passenger revenues of $164,300 and trains 14 and 15 earned passenger revenues of $188,900 in the first 10 months of 1964.
"We can only infer from the railroad's refusal to provide a monthly breakdown of the number of passengers on trains 19 and 20 that such a breakdown *499 would show a seasonal pattern in patronage of the trains, with the vast majority of the riders concentrated in the summer months, and particularly on days of night baseball games in Detroit. A commission staff member testified to having ridden train 19 from Detroit to Grand Rapids on Friday, December 18, 1964, and being the only passenger on such train, other than the commission's counsel, who accompanied him. Thus, even if trains 19 and 20 could be considered `passenger trains', within the meaning of the proviso clause of section 13 (c) of the railroad act, the railroad has failed to show that such trains are not seasonal trains, and therefore, not properly to be considered as part of the two passenger trains in each direction.
"The railroad provides no special facilities or services for passengers riding trains 19 and 20. Baggage may not be checked, but must be carried by the passenger himself into the combination car, and placed on a rack or seat. No ticket sellers or porters are on duty at the Detroit depot at or shortly before the time of departure of train 19. No ticket sellers or other attendants are on duty in Lansing after 8 p.m. No railroad personnel are present at Grand Rapids upon the arrival of train 19 to assist or receive passengers. However, a large number of employees are present at both the Lansing and Grand Rapids depots for the receipt and handling of mail in connection with train 19. In Grand Rapids, more than a dozen employees assist in the handling of mail arriving on train 19. In contrast, there are ticket sellers in Detroit, Lansing, and Grand Rapids, and porters at Detroit, to accommodate passengers taking the daytime trains. As shown by the train schedules recited earlier in this opinion, trains 19 and 20 require 5 to 15 minutes longer to make the Detroit-Grand Rapids trip than do the other trains on that route, due to the longer stop at Lansing for the handling of mail. * * *
"Even if trains 19 and 20 are not seasonal trains within the meaning of the act, we find that such *500 trains are not passenger trains within the meaning of the proviso clause of section 13 (c). It is obvious that the description given by a railroad to a train, whether passenger or freight, is not determinative of the question of whether the train is a passenger train within the meaning of the act. The legislature did not intend that the commission's jurisdiction and duty to insure adequate passenger service in this State be defeated by mere semantics. Also clear is that the mere publishing of a passenger tariff for a particular train and the providing of a place for passengers on such train, no matter how limited in size or facilities, do not make a freight or mail train into a passenger train within the meaning of the act. `Passenger trains,' as used in the act, mean trains which earn a substantial portion of their revenue from the transportation of passengers, which are scheduled to meet the needs and convenience of the traveling public, and which are operated at least in major part for the purpose of providing transportation to the public. * * * As detailed throughout this opinion, trains 19 and 20 were placed into operation for the purpose of transporting mail; the addition of a passenger car thereto, and the publishing of passenger tariffs and schedules were for purposes almost entirely disassociated from the desire to engage in the business of transporting passengers on such trains; almost none of the usual depot and on-train facilities and personnel are available to passengers on such trains; and the number of passengers and the revenue therefrom are insignificant when compared with the passengers and revenues on trains 11 and 12 and 14 and 15, or when compared with the revenues from mail, express, and other commodities handled by trains 19 and 20. Trains 19 and 20 are essentially mail or freight trains which only incidentally handle passengers, and then for reasons not related to the needs or convenience of the traveling public or the revenues that might be derived from the transportation thereof."
*501 The December 23, 1964, order of the public service commission occasioned two separate lawsuits. On December 31, 1964, the city of Grand Rapids filed a complaint, with a copy of the commission's order attached, in the superior court of Grand Rapids, alleging that the railroad intended to discontinue trains 14 and 15, and that such action would irreparably injure the city of Grand Rapids and its citizens by depriving them of the use of the trains and by causing economic loss to its businesses. Pursuant to Grand Rapids' prayer for relief, the court issued an order to show cause and a temporary restraining order prohibiting the railroad from discontinuing trains 14 and 15 without approval of the public service commission. On January 15, 1965, the circuit court for the county of Kent, to which the cause had been transferred on January 1, 1965,[1] allowed the public service commission, the attorney general, the city of Detroit, the city of Wyoming, and the city of Lansing to intervene in the actions as parties-plaintiff. The complaints of the intervening plaintiffs adopted substantially the complaint of the original plaintiff. Upon motion of the railroad, the court, while continuing the temporary restraining order, transferred the cause to the Ingham county circuit court, where it was assigned number 2856-C.
The other suit was instituted on January 12, 1965, when the railroad filed a complaint with the Ingham county circuit court, assigned number 2758-C, pursuant to the appeal provision of CLS 1961, § 462.26 (Stat Ann 1965 Cum Supp § 22.45), asking that the commission's order be vacated and the commission be enjoined from enforcing the order. A copy of the commission's order was attached to the complaint. The court permitted *502 the city of Lansing, the city of Wyoming, the city of Detroit, the city of Grand Rapids, and the railroad brotherhoods to intervene as parties-defendant. The commission counterclaimed, asking that the court order enforcement of its order of December 23, 1964. On February 11, 1965, the court heard the cross-motions of the parties for preliminary injunction, the railroad asking for preliminary injunction restraining enforcement of the commission order, and the commission asking that the railroad be restrained from discontinuing trains 14 and 15 pending final decision in the case. On April 7, 1965, Ingham county circuit court issued an opinion in case No. 2758-C, which held that trains 19 and 20 were passenger trains within the meaning of CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32). In part, the court held in its opinion as follows:
"In this court's opinion, the principal point and aim of the statute is the regulation of `passenger service' and when the legislature used the term `passenger trains' in the proviso of the statute it did so as being synonymous of `passenger service' as used in the body of the statute, and further, that if bona fide passenger service was offered on a train then that train for the purposes of the act would be a passenger train. If the legislature had intended otherwise it seems it would have either used the term `passenger trains' in the body of the statute or would have gone further and set forth the intended distinction.
"As to trains 19 and 20, it is clear that plaintiff has operated them on a regular schedule between Detroit and Grand Rapids for a period of upwards of four years; that passenger service time tables have been published and distributed to the public generally during this time concerning said trains; that 2,535 passengers were carried thereon during the first 10 months of 1964, with a revenue therefrom *503 amounting to $9,500 and that there has been a continued `holding out' to the public that said trains offered passenger service. It seems clear from the foregoing that a bona fide passenger service has been and is being offered on trains 19 and 20, whether said service is secondary or incidental to any other reason for running said trains, and meets the meaning of `passenger service' and `passenger trains' as used in the statute.
"Let us go on and determine whether trains 19 and 20 are in fact passenger trains within the meaning of decided cases and other authority. Black's Law Dictionary, page 1335, defines passenger trains as:
"`Any train used to carry members of the general public for hire.' Adams v. Yazoo & M.V.R. Co., 115 Miss 865 (76 So 733, 734); Power v. Gainesville & N.W.R. Co., 16 Ga App 732 (86 SE 61); Kansas City & M.R. Co. v. Huff, 116 Ark 461 (173 SW 419, 421); Nadler v. Illinois Commercial Men's Ass'n, 188 Ill App 459, 460; Chicago B. & Z.R. Co. v. Railroad Commission of Wisconsin, 152 Wis 654 (140 NW 296, 299).
"74 CJS, Railroads, § 1, p. 336, provides:
"`Passenger train. * * * Ordinarily it signifies a train advertised to take passengers generally, people traveling from place to place, on the terms and in the manner ordinarily applicable to such passengers, their baggage, mail, and express only. * * * While accommodation freight trains are not passenger trains in the ordinary sense of the terms, and the carrying of passengers in a caboose attached to a freight train does not change the freight train into a passenger train, the term `passenger train' need not be applied only to a train devoted exclusively to the transportation of passengers. A train is still a passenger train if it has all the facilities and conveniences for passengers which the law requires, even though the carrier may transport at the same time and on the same train shipments of freight.'
*504 "Trains 19 and 20 appear to come within the foregoing definitions. In the final analysis there appears to be no material distinction between plaintiff's trains 19 and 20 and plaintiff's other trains which are conceded to be passenger trains. The difference lies only in quality and quantity. Plaintiff's other trains by virtue of schedule carry many more passengers and presumably for the same reason less `road railers' than do trains 19 and 20. Trains 19 and 20 for the same reason carry more `road railers' and fewer passengers than plaintiff's other trains. All of plaintiff's trains in this court's opinion are mixed trains operated as passenger trains within the definitions and cases cited in support of the definition as well as the statute.
"Also it appears to the court that it cannot be said that the passenger service offered on trains 19 and 20 due to the small number of persons carried or the manner in which it originated is subordinate to other service offered on said trains. Regardless of the number of persons carried or how the service came about or the volume of freight carried, the passenger service has been `held out' and carried on as such and in a sense independent of other services offered on said trains. * * *
"The commission also concluded in its order that plaintiff's trains 19 and 20 are seasonal trains and therefore plaintiff is not exempt from petitioning before discontinuance of trains 14 and 15. The defendants appear to have abandoned the commission's conclusion in this regard. However, in the event that they have not, this court concludes that it appears from all of the foregoing that passenger service on trains 19 and 20 is not offered seasonally and is not seasonal but is offered and carried out on a regular basis and said trains are not seasonal trains within the meaning of the statute.
"The final question before the court is whether it should now issue an injunction. The usual defenses to a temporary injunction, such as maintaining the `status quo,' `irreparable injury,' and the *505 balancing of equities have been asserted. However, such defenses appear not to be applicable under the circumstances in this case. The issue before the court has been and is one of law only, namely, whether the commission correctly interpreted the statute. It has been determined that it did not, and that determination is decisive. Thus, it is concluded that an injunction issue now which will be labeled a temporary injunction, but which in reality finally disposes of the case in this court."
The court's opinion was based upon the pleadings filed in this case, and also the hearing record and opinion order of the public service commission. On the same date, the court issued an opinion in case No. 2856-C, which held that its opinion in case No. 2758-C was controlling and, therefore, the plaintiffs in the case transferred from Grand Rapids were not entitled to relief. Pursuant to these two written opinions, the court, on April 19, 1965, issued a final judgment in case No. 2856-C, which adjudged that the plaintiffs were entitled to no relief, and in case No. 2758-C issued a temporary restraining order which enjoined the public service commission from enforcing its order barring discontinuance of trains 14 and 15 by the Chesapeake & Ohio Railway.
This case is further complicated by the fact that the public service commission was successful in having rushed through the legislature PA 1965, No 15 (Stat Ann 1965 Cum Supp § 22.32[c]), which amended CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32) by eliminating the provisions which excepted from the jurisdiction of the public service commission railroads operating more than two passenger trains in each direction on the portion of the railroad affected by changes in passenger service schedules. This act took immediate effect on April 16, 1965, upon signing by the governor. The commission's motions in each case to dismiss the action for *506 mootness on the theory that the railroad's defense was eradicated by statutory amendment were denied by the circuit court. The public service commission then appealed to this Court by a claim of appeal in No. 2856-C and under the grant of application for leave to appeal in No. 2758-C. The circuit court granted a stay of its temporary injunction issued in the latter case, pending appeal to this Court.
The first issue requiring decision by this Court is whether the exemption, under paragraph (c) of CL 1948, § 462.13 (Stat Ann 1963 Cum Supp § 22.32) is lost by legislative elimination of the exemption while the railroad is prevented from exercising its rights under the exemption by a temporary injunction. PA 1965, No 15 contains nothing which indicates that the legislature intended it to have any retroactive application. It is a fundamental principle of statutory construction that statutory amendments not be given any retroactive effect unless the legislature clearly and unequivocally indicates otherwise. In re Davis Estate (1951), 330 Mich 647; Finn v. Haynes (1877), 37 Mich 63. The statutory amendment during the pendency of a suit has no bearing upon the rights of the parties fixed by law before its enactment. Lippman v. Cort (1927), 240 Mich 366; Taylor v. Burdick (1948), 320 Mich 25. If the Chesapeake & Ohio Railway's passenger operation between Detroit and Grand Rapids was exempt from the control of the public service commission in regard to the change of passenger schedules, by virtue of its operating three passenger trains on that section of the railroad in question, then the railroad has not lost that right because its exercise has been delayed by the legal action of the public service commission and certain Michigan municipalities.
This Court is then faced with the issue of whether or not trains 19 and 20 are passenger trains within *507 the meaning of the statutory section herein at issue. Words and phrases are supposed to be construed according to their common meaning. (CLS 1961, § 8.3a [Stat Ann 1961 Rev § 2.212(1)].) What, then, is commonly understood by the term "passenger train"? In Commissioner of Railroads v. Wabash R. Co. (1900), 123 Mich 669, 671, it was held that a passenger train consisted of its passenger, baggage, express, and mail cars. It would seem, therefore, that the carriage of baggage, express, and mail in no way prevents a train from being termed a passenger train. Upon examination of the cases cited in 31A, Words and Phrases, Passenger Train, pp 87-89, it would seem that a passenger train is a train which is available for and actually used to carry passengers from among the general public on a regular schedule and which is held out or advertised to the public as such. The findings of the public service commission, as stated in their order of December 23, 1964, indicate that trains 19 and 20 were not used for carrying freight, had been in operation on a regular schedule since June of 1960, and were continually available for and actually did carry passengers, although at hours not likely to promote their use. The trial court was correct in its determination that trains 19 and 20 were passenger trains. The matter was, therefore, outside of the jurisdiction of the public service commission.
At this point, the first procedural question raised by the appellant public service commission enters into the picture. The appellant commission contends that the final judgment of the circuit court in case No. 2856-C deprived it of a trial on the merits with an opportunity to introduce further evidence, and also deprived it of the chance to make use of the discovery and pretrial procedures outlined by the general court rules. The examination of the complaints of the parties in case No. 2856-C reveals that, *508 under the court's interpretation of the term "passenger train," the parties plaintiff failed to state a cause of action. The complaints of the plaintiffs all alleged that the public service commission had held a hearing to determine whether or not the Chesapeake & Ohio Railway was operating three passenger trains each way between Detroit and Grand Rapids, and had issued an order requiring continuance of the operation of trains 14 and 15, and that there was reason to believe that the railroad would not comply with the said order. Since this Court has held that the public service commission lacked jurisdiction on the basis of its own factual findings, the necessary conclusion is that the parties plaintiff in case No. 2856-C have failed to show a claim for relief, and therefore, their complaints would have been subject to dismissal upon the grounds of lack of jurisdiction.
The appellant public service commission also contends, as a second procedural question, that the trial court erred in issuing a temporary injunction based on the court's view of the ultimate merits of the litigation, and without regard to preservation of the status quo, or prevention of irreparable injury. The commission has cited numerous authorities to support its contention that the only purpose of temporary injunction is to maintain the status quo, and that the status quo before litigation was the continued operation of trains 14 and 15. It is clear that the trial court followed an irregular procedure in stating that the temporary injunction which it was going to issue was really not temporary at all, but was a final adjudication. Having held in case No. 2856-C that the complaints based upon the same commission order at issue in case No. 2758-C failed to state a cause of action, the same conclusion must follow in case No. 2758-C, since both cases involve the same parties. In any event, the appellant can *509 not be heard on appeal to claim that the granting of an injunction in appellees' favor is reversible error, as both parties sought injunctive relief in the trial court.
The trial court was right in the merits and the outcome could not possibly be different upon a fulldress trial, without or with a discovery and other pretrial proceedings. The procedural defects below shall be corrected by entry in this Court, in case No. 2856-C, of a dismissal for lack of jurisdiction, and in case No. 2758-C by issuance of an order vacating the order of the public service commission dated December 23, 1964, with a permanent injunction against the enforcement of this order.[2] No costs, a public question being involved.
LESINSKI, C.J., and T.G. KAVANAGH, J., concurred.
NOTES
[1] See PA 1964, No 262, amending CLS 1961, § 600.518 (Stat Ann 1965 Cum Supp § 27A.518).  REPORTER.
[2] GCR 1963, 820.1(7).